[Crim. No. 1824.   Third Dist.   May 27, 1943.]

THE PEOPLE, Respondent, v. JAMES PATTERSON, Appellant.

Albert King for Appellant.

Robert W. Kenny, Attorney General, and T. G. Negrich, Deputy Attorney General, for Respondent.

THOMPSON, J.—Defendant was charged by information with the commission of an unlawful assault upon one Ted Carter by means of force likely to produce great bodily injury. The crime charged constitutes a violation of section 245 of the Penal Code. After trial by jury the verdict of guilty was returned and this appeal is from the judgment of conviction.

It is contended that the judgment of conviction must be reversed for the following reasons: Denial to defendant of a fair and impartial jury trial resulting from an arbitrary restriction of the veniremen to the Oroville section of the vicinage, that the verdict of the jury is contrary to law, that the evidence is insufficient to support the verdict, and that the court erred in certain rulings in regard to the admission of evidence.

The circumstances connected with the assault upon Ted Carter, which resulted in his receiving a number of wounds inflicted with a knife, may be fairly summarized as follows:

All parties concerned with the affray which resulted in the commission of the assault in question were, on the evening of October 4, 1942, present at an establishment whose business was the sale for consumption on the premises of light wines and beer. This cafe is known as the Log Cabin and is located in the city of Chico.

The defendant and his party, which included his wife and his daughter, arrived at the Log Cabin Cafe sometime shortly after five o'clock. The members of this group ordered and consumed some beer, and the defendant and Mrs. Patterson also amused themselves for the first half or three quarters of an hour by playing a slot machine. The complaining witness, Ted Carter, a soldier who was at the time of the assault in question stationed at the Army Flying School at Chico, entered the cafe sometime after the arrival of the defendant and his party. Shortly thereafter Carter met the defendant, the defendant's wife, and their thirteen-year-old daughter. Some of the patrons of the cafe were dancing and Carter had two dances with the defendant's wife and two dances with the daughter. At about this time, according to the testimony of witnesses, the defendant's wife slapped Carter in the face with her purse, and immediately thereafter, as he was seated at the bar with his back turned toward her, the defendant's wife broke a beer bottle or glass over his head and was proceeding to jab him in the back of the head or neck with a broken portion thereof when interrupted by a bystander. This action on the part of defendant's wife was explained by her testimony and the testimony of the daughter to the effect that Carter had proposed to both of them, separately, that they accompany him outside of the cafe. The action of defendant's wife in breaking the glass or bottle over Carter's head resulted in an inconsequential fist fight between Carter and the defendant. This fight was soon stopped by bystanders and apparently neither the defendant nor Carter received any injury. The defendant then left the barroom of the cafe and proceeded through the entrance door to the outside of the building. In a few moments, according to the testimony of one of the witnesses, the defendant reappeared at the entrance door of the barroom and in loud and vulgar language challenged Carter and anyone else present to come outside and fight. Carter left the barroom and did go outside a short time

after the defendant challenged him to fight, and immediately thereafter the fight between them was resumed. The testimony is in conflict as to just which parties were involved in this second affray, but it is admitted that Carter and the defendant were fighting one another and that it was during this time that Carter slumped to the ground with five knife wounds in his back. These knife wounds varied from six to eight inches in length and in some instances were three-quarters of an inch in depth, penetrating the substantia tissue. Carter's injuries required his hospitalization for approximately ten days.

Carter testified that Patterson preceded him in leaving the cafe and that Patterson was outside waiting for him as he and a soldier friend, Zutter, walked out of the door. Carter's testimony in part is as follows:

"A. We walked out the door and that is when the fight started outside. Q. Was Mr. Patterson out there? A. Yes. Q. And, in that respect, how did that fight start? A. I think he said he was—that he could lick anybody that was in there and added a few names to it. Q. He said he could lick anybody that was in there, and used some vile words? A. Yes sir. . . . Q. Now then, do you recall what happened in the fight? A. Well, some of it, yes. Q. What do you recall? A. I know we were fighting there, and I remember once of when I went by him, I remember of feeling him hit me in the back with a knife, or something, I remember that. Q. You felt some pain in your back? A. Yes. Q. By the way, in that fight, from what you stated you were cut up, were you? A. Yes. . . . Q. Did you have any weapons of any kind on your person? A. No sir. Q. Did you use anything in this fight other than your fists? A. No, sir. Q. I want to ask you about the fight itself, outside at the time you were cut. Do you remember anyone else being in that fight and fighting against you other than Mr. Patterson at that time? A. No, I do not. Q. Just the two of you, that is your recollection? A. Yes, sir."

Mr. Zutter, Carter's friend, testified that the defendant, his wife Mrs. Patterson, and Mr. Robbins, a friend of the defendant, were all three fighting with Carter, that as he made his way around an automobile and grabbed Carter that Carter said to him that somebody had stabbed him; that Carter then fell to the ground and Zutter dragged him out from between the automobiles where the fight had taken place.

Mr. Garrison, a ranch hand, who stood at the door of the

cafe and witnessed the fight, testified that at one time the defendant, his wife, Mr. Robbins, and Carter were all in a huddle together, and that he didn't believe anyone was being hurt as they were all so drunk.

Shortly after the fight was ended the defendant and Robbins left the scene of the affray in an automobile belonging to Robbins and the defendant was driven to his home. As they were leaving the cafe premises they were observed by two young men who had been attracted to the scene by observing the complaining witness, Carter, as he lay injured on the ground. These young men sat in their parked car located near the one belonging to Robbins. According to their testimony, they overheard the defendant tell Robbins to get him away from there as he had knifed the soldier. The testimony of Joe Shreve, one of the young men present on the occasion, is as follows:

"Q. And you and your friend sat right in the car did you? A. Yes, we did at first. Q. At first? A. Yes, sir. Q. Now then, did you see the defendant in this case, Mr. Patterson and a man named John Robbins that night? A. Yes. They were standing right in front of the door of the Log Cabin Inn. Q. And did you hear any statement made by either of them? A. Not there. It seems as though they were fighting with some woman there trying to get her to get in the car or something, I couldn't say for sure. . . . Q. Did you later hear either one of them say anything? A. Yes. Q. What did you hear? A. When they came past our car there I heard them talking. Q. You heard them talking? A. Yes. Q. Did you hear Mr. Patterson say anything? A. Yes. Q. What did he say? A. He said, 'Get me out of here, I sure as Hell knifed that S—— of a B——.' Q. He said 'Get me out of here, I sure as Hell knifed that s—— of a b——'? A. Yes, sir. Q. There is no question about that in your mind? A. No question about it. Q. Who did he address those remarks to? A. To Mr. Robbins. Q. And that was as they came by the car here? A. Yes."

Earl Rorden, the other young man present, testified, as did young Shreve, that he overheard one of the two men say to the other that "I sure knifed Hell out of that s—— of a b——" and "let us get out of here," but Rorden could not say which of the two men had made the statement, although he did identify Robbins as one of the two men present when he later

saw him in the light after Robbins had returned to the Log Cabin.

Rorden and Shreve followed the defendant and Robbins as they left the cafe premises in the car belonging to Robbins; and procured the license number of the car by the time the defendant had reached his home. Rorden and Shreve then returned to the Log Cabin Cafe.

Mrs. Marie Lewis, a witness for the prosecution, and a daughter of Mr. John Robbins, also testified that she heard the defendant make the statement that he had stabbed somebody. The Robbins' home is located adjacent to the home of defendant, with only a vacant lot intervening, and Mrs. Lewis testified that on the evening of the assault in question she saw her father drive up in front of defendant's home and observed the defendant alight from the car. She also testified that her attention had been directed to the home of defendant because of the commotion that was taking place, and that she heard defendant say that he had knifed somebody. She further testified that she walked over to where the defendant and her father were talking and that shortly after that when the defendant's wife, Mrs. Patterson, and their little girl were present, she heard the defendant repeat the statement that he had stabbed somebody.

Mr. Larry Gillick, Undersheriff of Butte County, testified that the defendant on October 5, 1942, made a voluntary admission. Sheriff Taylor and the district attorney were present when that statement was made. The defendant admitted that an affray occurred between himself and Ted Carter outside of the Log Cabin Cafe and that he cut the prosecuting witness several times with a knife. Gillick testified in part:

''He [the defendant] said, 'I hit the soldier boy and followed him out there,' and the soldier boy got up and hit him and knocked him down, and he said, 'I was not going to stand by and get beaten up by someone bigger than myself,' and he said 'I took my knife' and that . . . as he would come at him he would side step him and swing at him as he went by, and he said the first couple of times, he said he thought he missed him, but he said he must have hit him four or five times. Q. Was it at time . . . as he went by . . . he swung at him with a knife? A. Yes. He said then that he left, and that when he left the soldier boy was laying face down between two parked automobiles; and he got in the car with John

Robbins and told John Robbins that he had used a knife on a man.''

The defendant contends that he was denied the right of a fair and impartial trial by jury, because the trial court excused several veniremen from the panel on account of the great distances at which they resided from the county seat, and he was therefore forced to trial only by jurors who resided at or near Oroville.

Article I, section 7, it is true, guarantees all persons charged with crime a fair and impartial trial by jury. But it is within the power of the trial judge to excuse individuals from the venire when good cause and a legitimate reason therefor are disclosed to the court. The greater number of individuals comprising the venire were excused from serving on the jury because of the wear and tear that would result to the automobile tires in traveling necessarily long distances to the place of trial. The rubber shortage is of common knowledge to all at this time and it cannot be said that there was any abuse of discretion on the part of the trial judge in excusing members of the venire on this account. It is difficult to follow the reasoning of appellant in the contention that the excusing of these veniremen from duty prevented him from receiving a ''fair and impartial'' trial or that the action of the court resulted in a trial by a jury composed of ''particular individuals.'' Appellant cites the case of *People* v. *Shannon,* 203 Cal. 139 [263 P. 522], in support of the contention that he has a right to a trial by a fair and impartial jury, and not to a jury composed of any particular individuals. In the Shannon case women had not been included in the panel for 1927, because, as indicated by the county board of supervisors, the courthouse of that county was improperly equipped for jurors of both sexes. The defendant contended on appeal that his constitutional right to ''a trial by a jury of men and women'' was violated through the action of the board of supervisors. This contention was answered by the court in the following language found at page 142 of the opinion:

''It appears that the defendant did not interpose any challenge to the panel before the jury was sworn in the trial court, and it is, therefore, too late to present the objection here. . . . The unauthenticated affidavit presented in this court for the first time does not serve to properly bring the matter to our attention. Assuming, however, that the point is properly be-

fore us, there is nothing in the state or federal Constitutions, or in any statute, which guarantees one accused of a crime a trial by a jury composed of men and women, or of only men, or of only women, or of any definite proportion of either sex. His right is to a fair and impartial jury, and not to a jury composed of any particular individuals. . . . He cannot complain if he is tried by an impartial jury and can demand nothing more."

There is nothing contained in the opinion of the court in the Shannon case which supports a conclusion that the action of the trial judge in the instant case resulted in a trial by a jury composed of particular individuals. The fact that the greater proportion of the venire was excused for the reason heretofore stated and that the jury was ultimately made up of individuals residing in Oroville and vicinity did not constitute the jury as one made up of particular individuals. (*People* v. *Ferguson,* 124 Cal.App. 221, 226 [12 P.2d 158]; *People* v. *Britt,* 62 Cal.App. 674, 683 [217 P. 767].)

The record also fails to disclose that appellant was in any way prejudiced by the absence of residents of Chico upon the jury regardless of the fact that Chico was appellant's place of residence. The usual ground for complaint, where it is contended that there has been a denial of a fair and impartial trial, exists when the defendant has been denied a change of venue from the scene of the alleged crime. If, as a matter of fact, under a proper showing of local public prejudice, the trial in the instant case had taken place at Chico and the jury had been composed solely of residents of that community, there might then have been some reason to contend the defendant was denied a fair and impartial trial. No such showing was made in this case. ■ However, even if it were to be assumed that the trial judge acted in an arbitrary manner in excusing certain veniremen for the reasons stated, the appellant is in no position to complain at this time. The record discloses the fact that the appellant failed to exhaust his peremptory challenges. There remained five unused peremptory challenges which might have been exercised in his behalf. Appellant also declared a number of times during the proceedings that he was satisfied with the jury. There is no indication in the record that any objection was made at any time to the excusing of veniremen, to the method of selecting jurors, or to the drawing of the panel. As a matter of fact, at the close of the trial and just prior to the arguments to the jury, counsel and the

defendant were invited into the judge's chambers and asked if there were any objections to the method employed in drawing the jury panel. The district attorney and the attorney for the appellant, the appellant being present at the time, stipulated that there was no objection to the method of drawing the jury panel or to the selection of jurors.

Appellant's contention that the verdict of the jury was contrary to law and that the evidence is insufficient to support the verdict may be considered together, as appellant insists that a conclusion by the jury that he is the person who stabbed Carter is, in view of the court's instructions, contrary to law and also unsupported by the evidence.

After retiring, the jury returned to have the testimony of the three witnesses, Zutter, Hurley and Garrison read to them. As heretofore indicated, these three witnesses were eyewitnesses to at least a part of the affray between appellant and Carter. Each of these witnesses testified that at one time during the fight which occurred outside of the cafe, the appellant, his wife, Mrs. Patterson, Mr. Robbins and Carter were all in a huddle together. The three witnesses also testified that they did not see anyone use a knife during the affray. It is urged by appellant that, in view of the fact that the evidence discloses that these three witnesses were sober at the time of the affray and that the other witnesses, including the participants in the fight, were intoxicated at that time, it must be concluded that the jury arrived at its verdict after having read to them the testimony of these three witnesses. With this conclusion in mind, it is further argued that the jury did not follow the instructions of the court, for if they had they could not have arrived at a verdict of guilty. It is urged that the testimony of the three witnesses, Zutter, Hurley and Garrison, is susceptible of only three possible conclusions, which are: That Carter was stabbed by Robbins, that Carter was stabbed by Mrs. Patterson, or that if appellant stabbed Carter it was in self-defense. One of the instructions which it is contended the jury failed to follow, in view of the testimony of the three witnesses mentioned, reads as follows:

"Where the facts in the case, considering the evidence as a whole, are susceptible of two reasonable interpretations, one looking toward the guilt and the other toward the innocence of the defendant, it is your duty to give such facts and the evidence the interpretation which makes for the innocence

of the defendant rather than adopt the one looking towards his guilt.''

There is substantial evidence in support of the verdict, and it is difficult to comprehend, in view of the evidence introduced at the trial, how the jury could have arrived at any other verdict than guilty. The verdict of the jury was wholly consistent with the quoted instruction and other instructions given for the purpose of placing a standard of guilt or innocence before the jury. The complaining witness, Carter, testified that while fighting with the appellant he remembered ''feeling him hit me in the back with a knife, or something, I remember that.'' The witness Joe Shreve testified that he heard the appellant say to Mr. Robbins, just after the affray, ''Get me out of here, I sure as Hell knifed that s—— of a b——.'' Mrs. Lewis, the daughter of Mr. Robbins, testified that she heard appellant state in front of his home after he had arrived there on the evening of the fight that he had stabbed somebody. The testimony of Carter, Shreve and Mrs. Lewis, when considered with the admitted facts in connection with the fight between Carter and appellant, constituted sufficient evidence in support of the verdict.

It is unnecessary to speculate on the purpose in the minds of the jurors in the request to have the testimony of Zutter, Hurley and Garrison read to them. The reading of this testimony could have been for the purpose of clearing up any one of a great number of questions presented by the evidence during the trial. It certainly cannot be presumed that such request was made in order to determine the sole question as to whether appellant was the one who had done the stabbing, nor is there any logic in appellant's argument that the jury arrived at its verdict only after the reading of this testimony. Following the reasoning of appellant, that is, that the testimony of these three witnesses indicated the innocence of appellant, and that the verdict was contrary thereto, it would have to be presumed that the jury had already concluded from other evidence admitted during the trial that appellant was the one who stabbed Carter.

The jury may have arrived at their verdict without relying on the testimony of any one of the last three mentioned witnesses, or may have accepted the testimony of all or any one of such witnesses as bearing upon some particular phase of the case. As indicated, other competent evidence referred

to was sufficient to support the verdict rendered and the jury were not bound to accept or reject the testimony of any particular witnesses.

■ Appellant makes the final contention that the court erred in sustaining an objection on the part of the district attorney to a question asked Carter in regard to a previous fight in which he had been a participant at the Log Cabin Cafe some three weeks prior to the time of the assault in question. In support of this ground for reversal the following language from 13 California Jurisprudence 693, section 77, is quoted:

"But while the general rule is that the reputation of deceased cannot be given in evidence, an exception arises where the plea of self-defense is interposed, and the evidence leaves it in doubt whether the deceased was the aggressor, or where the circumstances attending the homicide render it doubtful whether the defendant was justified in believing himself in imminent danger at the hands of deceased."

Under such circumstances, the appellant argues, the deceased's reputation for peace and quiet is material.

Assuming that self-defense properly became an issue before the jury, and further assuming that the evidence introduced at the trial was of such a nature that a doubt remained as to which party, appellant or Carter, was the aggressor at the time of the assault, nevertheless the court properly sustained objections to questions asked Carter in regard to previous fights at the Log Cabin. The only issue which might have been properly placed before the jury at that time was Carter's general reputation for peace and quiet. Any evidence attempting to disclose specific prior instances in which Carter had been engaged in fights was inadmissible and properly rejected by the court. The appellant cannot complain of the court's ruling on this issue, as he made no attempt to introduce testimony of witnesses bearing on the issue of Carter's reputation for peace and quiet. (*People* v. *Soules*, 41 Cal.App.2d 298 [106 P.2d 639].)

In answering the foregoing contention of appellant, we have, we believe, given appellant the benefit of every doubt, as it is quite questionable under the circumstances as to whether the issue of self-defense was involved. The defense of appellant proceeded throughout the greater portion of the trial on the theory that he had not been the one who stabbed Carter, and evidence to this effect was introduced

by the defendant, even though he never took the stand in his own defense. The two theories of defense interposed by appellant were absolutely contradictory and in our opinion the issue of self-defense was one not to be considered by the jury.

It might be added that the evidence introduced at the trial fails to disclose any justification for the malicious attack made upon Carter by appellant, and certainly the verdict of the jury cannot be construed in any sense as amounting to a miscarriage of justice under section 4½, article VI, of the Constitution of California.

The judgment is affirmed.

Peek, J., and Adams, P. J., concurred.