[Crim. No. 2144. Third Dist. June 10, 1950.]

THE PEOPLE, Respondent, v. WILLIAM GRIFFIN et al., Appellants.

Robert Miller Green, Joseph Ball, Robert P. Dockeray, Jerry Giesler and Leroy Lounibos for Appellants.

Fred N. Howser, Attorney General, and Doris H. Maier, Deputy Attorney General, for Respondent.

James E. Busch, District Attorney (Mendocino), and Arthur H. Sherry, Assistant District Attorney, as Amici Curiae on behalf of Respondent.

THE COURT.—Appellants William Griffin, Wiley H. Caddel, and James Mulligan, together with defendants Fred Grange, Paul McCarty and Robert Gray, were jointly indicted in Mendocino County on five counts of felony. The first count charged conspiracy to violate sections 67 and 68 of the Penal Code, in that from about November 1, 1947, to and including June 13, 1948, all six defendants conspired to give and offer bribes to executive officers of this state, with intent to influence said officers in respect to their action and decision as such officers, and also charged that they conspired to ask for and agreed to receive bribes as executive officers and employees of the state upon the understanding that their action in matters then pending before the said executive officers and employees on matters which might be brought before them in their official capacities would be influenced thereby. Three alleged overt acts were pleaded as having been committed pursuant to this conspiracy. The second count charged all six defendants with conspiring to violate section 330a of the Penal Code, in that during the same period they conspired to have under their control, either as owners, agents, employees, or otherwise, slot machines upon the result of the action of which money was then and thereafter to be hazarded. Ten overt acts were alleged to have been committed pursuant to this conspiracy.

The defendants were then charged by the indictment with having violated section 67 of the Penal Code, as follows: Count Three charged all six defendants with having given a bribe to Sheriff B. G. Broaddus on April 30, 1948; Count Four charged all six defendants with having given a bribe to Sheriff Broaddus on June 3, 1948; and Count Five charged all six defendants with having given a bribe to Sheriff Broaddus' deputy, William White, on June 3, 1948.

Before the trial began, defendant Grange entered a plea of guilty to the first count of the indictment, and on motion

of the district attorney Counts Two, Three, Four and Five were dismissed as against him.

The trial of the case commenced on November 8, 1948. During its course, and before the People had rested their case, the court granted motions of the district attorney to discharge defendants Gray and McCarty in order that each might be made a witness for the People, pursuant to the provisions of section 1099 of the Penal Code.

On December 3, 1948, the jury returned its verdict finding each of the appellants guilty on each of the five counts of the indictment.

After denial of probation, judgment was rendered as follows: Each of the three appellants was sentenced to prison for the term prescribed by law on each of the five counts of the indictment; in the case of appellant Griffin, the term of imprisonment on each of the said five counts was ordered to run concurrently; appellant Mulligan's sentence provided that the terms of imprisonment imposed as to Counts One, Three, Four and Five should run concurrently, and that the imprisonment under Count Two should run consecutively to that imposed under the other four counts; appellant Caddel's sentence provided that the terms of imprisonment imposed under Counts One and Five should run concurrently, that the terms imposed under Counts Three and Four should also run concurrently, but should commence at the termination of the term of imprisonment imposed under Counts One and Five, and that the term imposed under Count Two should commence upon the termination of the term imposed under Counts Three and Four.

The three defendants moved for new trials, which motions were denied, and they have now separately appealed from the judgments of conviction, and from the orders denying their motions for new trials.

Prior to the trial appellant Caddel filed in this court a petition for a writ of prohibition to prevent the Mendocino County Superior Court from trying the cause. Said petition was denied.

The appellants contend in this appeal that the evidence was insufficient as a matter of law to justify the convictions; that testimony of accomplices was not corroborated as required by law; that the court committed error in denying motions for mistrial, for advisory verdicts and to strike evidence, and also in instructing the jury; that the court committed error in overruling demurrer to Count One of the

indictment; and that the district attorney was guilty of prejudicial misconduct.

The record on appeal is voluminous, the Reporter's Transcript alone containing 4,127 pages. Fifty-three witnesses were called and examined, and over 100 exhibits admitted into evidence.

Stating the facts in the light most favorable to respondent, as we are required to do (*People* v. *Newland,* 15 Cal.2d 678 [104 P.2d 778]; *People* v. *Hannon,* 44 Cal.App.2d 484 [112 P.2d 719]), they showed that defendant Fred Grange, who had been associated over a period of years in gambling enterprises, was, in the latter part of 1947 and in 1948, a part owner of Lane's Flat, a resort in Mendocino County. Appellant Griffin was an employee at Lane's Flat. Defendant Robert Gray was an owner and operator of slot machines and had lately been in partnership in the machines with one Gobels. This partnership having been split up, Gray, being in financial difficulty, contacted Fred Grange for assistance. After some conversations an agreement was reached whereby Grange would become a partner in the ownership and operation of the slot machines. Grange, in turn, agreed to co-sign a contract for Gray evidencing certain indebtedness on the machines to the Morris Plan, and to underwrite the monthly payments under said contract of $546.64, until such time as the revenue from the machines was sufficient to take care of the installments. Appellant Griffin took part in these discussions, and it was agreed that he would participate in the new arrangement, and in particular that he would act as mechanic for the slot machines.

Pursuant to this agreement, and on the 5th day of January, 1948, the contract with the Morris Plan was signed by Grange on behalf of Gray. Shortly afterward Gray's slot machines, which had been stored at Andy's Place in Willits, were moved in a truck by Griffin and Gray to Lane's Flat. The machines being in poor condition, it was necessary to have them repaired, and they were taken to San Francisco to the M. S. Wolf Distributing Company. Appellant Griffin went along so that he might become familiar with the mechanism of the machines. A system of bookkeeping was then set up in which the expenditures of the new business were entered, and, later on, the revenue. When the machines had been repaired they were returned to Mendocino County where the owners of various resorts were contacted and the machines placed on location and in operation.

In the preceding late summer, Grange had become acquainted with appellant Mulligan, a retired police officer of Los Angeles. In November of that year Mulligan had come to Lane's Flat and was there at a time when Grange, Griffin and Gray were also present. After that occasion in November Grange had seen Mulligan either at Lane's Flat or in San Francisco and they had talked about slot machine operations. Mulligan claimed to have a connection with the attorney general's office through appellant Caddel, who was employed by that office as an undercover operative. Mulligan and Caddel were friends of many years' standing, and Mulligan informed Grange that Caddel and he were partners. He also informed Grange that unless "arrangements" were made in Mendocino County slot machines would not be allowed to operate. He instructed Grange to get a list of the slot machine operators and their locations, and to find out what kind of fellows the sheriff and district attorney were, and who knew them.

Both Grange and Griffin undertook to do this. On two occasions Grange contacted different deputy sheriffs in Mendocino County and sought information as to what the "deal" was on slot machines. Both of these officers assured Grange there was none. In these conversations the policy of the attorney general's office on slot machines was mentioned, and Grange declared, "Well, I have that fixed." In his talk with Deputy Sheriff William White, Grange elaborated on the subject further by describing a method whereby the local officers might know that "everything was all right" with the attorney general's office. This consisted of the giving of a certain confirmatory sign or signal whereby a representative of the attorney general's office, at a prearranged time, would call on the sheriff for no ostensible reason, and then having merely passed the time of day would depart. Information as to the use of this signal had been given to Grange by Mulligan.

Griffin's efforts to obtain the desired information were along a different line. He introduced himself to Paul McCarty, originally indicted as one of the conspirators, and who was reputed to be the largest operator of slot machines in Mendocino County. He informed McCarty that he (Griffin) was going to be a mechanic for Bob Gray's machines, and that Grange had acquired an interest in them. Griffin then asked McCarty "what the score was in the county," how they ran slot machines there, and asked "who the person was to talk

to." McCarty replied that his brother, Pete, handled the matter.

Grange followed this up by also interviewing McCarty. He told McCarty of the partnership which he (Grange) now had with Gray, and since he was interested in the slot machine business he wanted to know what the deal was in Mendocino County. McCarty replied that there was no deal, but that he imposed upon the sheriff and the district attorney on the basis of long acquaintance with them, and that it was a friendship proposition.

Not being successful in these efforts to obtain the desired information, and meanwhile having been introduced to Sheriff Broaddus, Grange decided to go to headquarters and talk directly to the sheriff. This he did about the middle of February, 1948. In this conversation the operation of slot machines in Mendocino County was discussed. Grange touched upon the importance of such operations to the resorts, and that if they were permitted by the sheriff to operate machines there would be reciprocity in the form of substantial donations to the sheriff's campaign funds, or in any way he wanted to handle it. Grange assured the sheriff that the attorney general's office was "all right," and that nothing would be done by that office to embarrass the sheriff, or without previous notification. Grange then repeated to the sheriff the signal which he had previously related to White, that at an appointed time a man from the attorney general's office would call on the sheriff and say, "Good morning, I come from the attorney general's office, and how's everything, goodbye." Grange further alluded to another proof to show that he had a connection with the attorney general's office, to wit, that if the sheriff had some place which might be embarrassing to him to raid, that the attorney general's office would send the sheriff a complaint concerning the place, suggesting that the sheriff raid it, or the attorney general's office itself would raid the place. Sheriff Broaddus at first told Grange that he would not consent to anyone operating slot machines or violating the law, but at the conclusion of the conversation when Grange asked him if he (Grange) should see McCarty, the sheriff said that it was all right with him if he did. Grange took this as an intimation from the sheriff that the latter might go along with the proposition.

Grange's first meeting with Caddel occurred on February 16th. On that day Mulligan had made an appointment to

meet Grange at the San Francisco airport. Grange drove to San Francisco and met Mulligan as per appointment, and they went into the bar at the airport and ordered a drink. Shortly thereafter a man appeared and Mulligan said "That is Caddel." Caddel ordered a drink and then asked Mulligan, "Can I see you a moment?" The two stepped back from the bar. Later, when Mulligan left, Caddel walked up to Grange and said, "Whatever Mulligan tells you is all right with me; we are partners."

In this same month Gray became ill and was compelled to return from Lane's Flat to his home in San Francisco. A meeting was then arranged between Mulligan, Grange and Griffin to discuss the purchase of Gray's interest in the slot machines. On February 29th Grange and Griffin proceeded by plane to San Francisco, arriving there about 6 or 7 p. m., and registered at the Palace Hotel. They were assigned to a room on the eighth floor.. Appellants Mulligan and Caddel, with their respective wives, had registered at the Palace on the preceding evening, and also had rooms on the eighth floor.

After arriving at the hotel, Grange and Griffin went to Appellant Mulligan's room, where they saw Mulligan and his wife. On the table were four glasses, and appellant Mulligan remarked that "Buck" Caddel had just been there and gone down the hall. The three, Grange, Griffin and Mulligan, then discussed the purchase of Gray's slot machines, and Mulligan suggested they call Gray to make an appointment to see him. The hotel records show a call to Montrose 49657, the residence of Robert Gray, charged to Mulligan's room on February 29, 1948. On the following day Gray came to the Palace Hotel and met with Grange, Griffin and Mulligan. There was a variance in the testimony of Gray and Grange as to the time of the meeting, Gray fixing it in the afternoon, and Grange in the morning. In any event, a conversation was held about the sale and purchase of Gray's interest in the slot machines. It developed, however, that there was a difference of opinion about values. Gray wanted four or five thousand dollars for his interest, whereas it had been planned to offer him only one thousand dollars. Gray was requested to step out of the room for a few minutes, and the remaining three discussed the matter. Grange suggested that they offer Gray two thousand dollars. Appellant Mulligan thought for a moment and then said, "Well, I will have to go over and ask Buck." Mulligan left and was gone ten or fifteen minutes, then he came back and said it was OK

for two thousand dollars, that Buck would OK it for two thousand dollars. Gray testified that Mulligan was gone from the room about ten minutes, and after his return they continued to talk about the sale of the machines, but that Mulligan said he wanted no part in the transaction. The conference concluded by Gray's reserving his decision on the matter to a later date.

Grange testified that when he started to leave the eighth floor of the hotel on this occasion, on going towards the elevator, he met appellant Caddel coming up another corridor, and that Caddel approached him and said, ''Whatever deal Mulligan makes is OK, as we are partners.'' This meeting was denied by Caddel, and also it was stipulated to as a fact in the trial that Caddel checked out of the hotel at 10:30 a. m. of that day. As noted above, Gray's testimony was that the meeting occurred in the afternoon, and he was corroborated as to the time of his coming to the hotel by other witnesses.

A few days later Gray announced his decision of not selling his interest in the slot machines and of staying in the business. It was then suggested by Grange to Mulligan that the latter procure additional slot machines in order to equal the number of Gray's, and that a partnership be established which would consist of one-third interest for Gray, one-third for Mulligan, and one-third for Caddel. Mulligan said it would be a good idea, and he would tell Caddel about it. Under this arrangement Grange was to take over from Gray the two slot machines operated at Lane's Flat in consideration of three monthly payments on the Morris Plan contract, two of which had already been made by Grange. Later in March there was a further modification, whereby appellant Mulligan agreed to reimburse Grange for these payments, and to relieve Grange from responsibility under the contract, in consideration of which the two slot machines at Lane's Flat would be operated for the benefit of Mulligan and Caddel. Grange agreed to this arrangement, and informed Mulligan that $1,500 would take care of the three Morris Plan payments. Mulligan then told Grange that machines would be sent up to Lane's Flat accordingly, and that appellant Griffin would represent Mulligan and Caddel, and that they would make their own deal with Griffin.

On March 13th Griffin departed in Grange's truck for Los Angeles, having received word from Mulligan that there were some slot machines available there. In Los Angeles Griffin

went to the California Games Company, a retail slot machine sales company, purchased four slot machines and ordered two more. During his stay in Los Angeles Griffin also brought to the California Games Company three or four slot machines for renovation. On one occasion appellant Mulligan was with Griffin at the slot machine company and was talking with Griffin. Delivery of the machines purchased and of those renovated was taken by Griffin in the truck, and the two additional machines which he had ordered were shipped to Robert Gray at Sutton's Place, Mendocino County. Thomas Wall, who operated the California Games Company, had known Mulligan for sixteen years and Caddel for nine.

After Griffin had arrived back at Lane's Flat with the additional slot machines, resort owners in Mendocino County were further solicited for locations, and a number of them accepted the machines. Some who were approached by Griffin and Gray did not. Meanwhile Grange had been to see McCarty again and had given him $100 for Sheriff Broaddus.

The system of deducting a certain amount from the weekly receipts of each slot machine for "protection" began around the 1st of April. The amount so deducted each week was $10 per machine, $4.00 of which was to be for the state, and the other $6.00 to take care of the local authorities. These deductions were to be called "Repairs and Insurance" and Griffin was delegated to explain this to the location owners. This was done, and the practice of taking $10 off the top from each slot machine was begun. Collections from the machines were made by Griffin or Gray and were entered upon a printed form entitled "Collection Report" which showed the amount of money taken from the machine, and the division of it.

On April 5th appellant Mulligan came to Ukiah and registered at the Palace Hotel under the name of "Miller." After arriving there he conferred with Grange about the April pay-off. Grange then went in search of McCarty, and locating him, said, "The man is here for the money," and "wants a list of your locations." In this interview between Grange and McCarty a question came up as to whether or not there should be a payment required on machines operating merely as "free play" or solely on the automatic pay-off machines. McCarty objected to paying on the former, and inasmuch as Grange didn't know the answer, Grange went back to the hotel to consult Mulligan. Mulligan instructed Grange that no payment was required for the free play machines, and so

to inform McCarty. However, Mulligan added that McCarty would only get protection on the machines he paid for and that "if something happens to some of the machines he isn't paying for then not to come crying round about it." Grange conveyed this message to McCarty. A computation was then made of McCarty's machines, to wit: 16 machines at $8 for a two-week period begining April 1st, or a total of $128. Grange remarked it was a small amount for a man coming clear from Los Angeles to Mendocino County. After some discussion the amount was increased to $150. McCarty gave this sum to Grange in cash, together with a list of his machines. McCarty testified that the money he had given Grange was actually paid out of his own pocket, that he had not made any collection from any slot machine operators in the county, nor had he solicited any money from them. His purpose in giving Grange the money was to bait a trap for Grange on behalf of the sheriff. He said he wanted Grange to give him some proof of a connection with the attorney general's office, and that he wanted to get a look at the fellows Grange was supposed to be with.

The money obtained from McCarty, together with the list, was delivered by Grange to Mulligan in Mulligan's room at the Palace Hotel at Ukiah. Appellant Griffin was present at the time and made a copy of McCarty's list on the stationery of the Palace Hotel. It had two columns, showing both the places having free play and those having automatic pay-off machines .When Grange gave the envelope and the list to Mulligan, Mulligan said, "I have to call Buck and tell him that everything is all right, because he is very interested to know." Mulligan then made a long distance call and Grange heard him speak to the party on the other end of the line and say, "Everything has gone here as planned. Everything is all right."

Mulligan's next trip to Mendocino County was on April 29th. He proceeded to Lane's Flat and met Grange about 2 o'clock that afternoon. He told Grange that he (Mulligan) and Caddel had driven from San Francisco in separate cars, and that Caddel was stopping off to see the sheriff. Mulligan then suggested that Grange go back and see the sheriff, and ask him if he had a visitor, and if everything was all right. Grange replied that it was a bit late, and they agreed that Grange would see the sheriff the next morning.

On the same day, about 11:15 in the morning, appellant

Caddel appeared in the sheriff's office in Mendocino County, introduced himself to Sheriff Broaddus and showed his credentials, stating that he wanted to be sure that the sheriff knew who he was. He inquired if the sheriff had any "beef" with the attorney general's office. The sheriff replied he had none and that Caddel was the first man from that office to call on him. A short conversation was had between the two, lasting about five minutes, and appellant Caddel then left.

On the following morning Grange and Mulligan proceeded from Lane's Flat to Ukiah in Mulligan's car and drove up in front of the Palace Hotel. Mulligan gave Grange $200 in currency, which was placed in a white envelope. About 9:15 of that morning Grange called at Sheriff Broaddus' home and asked the sheriff if he had had a visitor on the day before. The sheriff replied in the affirmative. Grange then explained that he did not know that Caddel was going to call on the sheriff until early in the preceding afternoon, and consequently did not have a chance to notify the sheriff in advance of Caddel's visit. Near the end of this conversation Grange left a sealed envelope on the chesterfield in the sheriff's house, saying, "Here's something that will take care of you." The envelope was not picked up by Sheriff Broaddus until after Grange left, at which time the sheriff found that it contained $250 in currency. The sheriff later showed this money to Deputy Sheriff Bartolomie, and it, together with the original envelope, was introduced in evidence as People's Exhibit 3. After leaving the money with the sheriff, Grange returned to the Palace Hotel in Ukiah and picked up Mulligan.

Mulligan's visit to Lane's Flat continued from April 29th to May 4th. Meanwhile, Griffin had been looking for McCarty, and Mulligan remarked that McCarty was "a hell of a guy to do business with, you can never find him when you need him or want him." He added, "Well, you ought to forget about Mr. McCarty."

However, Grange located McCarty and informed him that he (Grange) had now produced proof to the sheriff of his connection with the attorney general's office, by Caddel's visit. Grange also told McCarty that he (Grange) had given some money to the sheriff. Grange complained because McCarty had not made his payment, to which McCarty replied that he did not have the money, but that he would bring it to Lane's Flat the next day and see the fellow from the attorney general's office.

On the next day McCarty started for Lane's Flat with the

money. On the road there he was intercepted by appellant Griffin in a pickup truck. The two stopped and stepped off the road, and Griffin handed McCarty an envelope from Grange in which was a list and a $100 bill. This $100 bill was intended for Sheriff Broaddus and was to be given to him by McCarty. The latter refused to accept the $100. He told Griffin, however, that he (McCarty) had some money and a list for payment. Appellant Griffin told him that if he had anything for Grange to put it in an envelope and he would give it to him. In doing so McCarty dropped the money and the wind blew it around. The two picked up the currency and it, together with the $100 bill, was placed in the envelope and taken by Griffin. When Griffin came back to Lane's Flat he handed Mulligan the envelope in the presence of Grange, and related what had transpired in the interview with Mc-Carty. Mulligan's visit at Lane's Flat was concluded on May 4th and he departed on that day for San Francisco.

In the accounts kept by Gray of slot machine business for the month of April, a statement dated April 30th showed total receipts for the month of $1,064.50. In the list of expenditures was an entry of April 30th entitled ''Podok'' in the sum of $250. ''Podok'' was a word used to indicate pay-off to the state and county, according to Gray.

In the latter part of April Grange received the $1,500 which Mulligan had agreed to pay him for Grange's interest in Gray's slot machines. It was paid in the form of a cashier's check drawn on the Security First National Bank of Los Angeles. Thomas Wall, the operator of the California Games Company, testified that in April of 1948, appellant Griffin requested Wall's secretary, Melba Wesson, to go across the street to the bank and purchase the check. Griffin gave her the money, and the check was made payable to and endorsed by Grange.

Two more slot machines were purchased in May and shipped C.O.D. to Willits, California. Appellant Griffin gave Gray the money for them, a cashier's check in the sum of $500, which Gray endorsed and took delivery of the machines, as evidenced by the tag of the Railway Express Agency. The $500 check was purchased by the same M. Wesson of the California Games Company, from the Security First National Bank of Los Angeles, and was made payable to W. A. Griffin. At one time Griffin had told Gray that Wall was the partner in Los Angeles. However, in referring to the $500 check in

a discussion with Gray, Griffin said, "Well, if this thing wasn't safe then Mr. Mulligan wouldn't have sent a check up for $500.00." Wall testified he had retained no interest in the slot machines sold to Griffin, that he had never received any revenue from them or from Griffin, and never was told anything about their operations.

On May 20th Sheriff Broaddus accidentally encountered Grange, and the latter invited the sheriff to Lane's Flat for a talk. The sheriff agreed to come in a few days. On May 22d there was a long distance call from Mulligan's number in Los Angeles to Lane's Flat. On the following day, May 23d, Sheriff Broaddus and his deputy, William White, went to Lane's Flat, where the sheriff met Grange and had a private talk with him in one of the cottages. Grange asked if the sheriff had any "beef" about slot machines and inquired about the operators along the coast. Then Grange told Sheriff Broaddus that a letter would be received inviting the sheriff to a meeting to be called by the attorney general in Los Angeles right after the first of June. Grange then gave the sheriff a list of operators of slot machines, and suggested a "token" raid prior to the meeting in Los Angeles so that the sheriff could report the same there. The sheriff informed Grange he was taking a prisoner east, and that meanwhile Grange should take care of Deputy White, who was suspicious. This Grange agreed to do, and at the conclusion of the conference, which lasted some thirty-five minutes, Grange, when they had returned from the cabin, shook hands with White and said, "I will see you later."

On the 3d of June, Mulligan appeared on the scene again and registered at the Palace Hotel in Ukiah, room 237, under the fictitious name of Wilson. Grange met him there, and Mulligan coached the former on what Sheriff Broaddus was to report at the Los Angeles meeting, namely, that the sheriff was not to say that there were no machines in Mendocino County, but that there were a few and he was making raids, and that he had been pretty busy, and that there would always be a few machines. On that same day Grange contacted McCarty for the June pay-off, but with negative results. McCarty reported that he had not been able to get the operators to pay him. Grange then asked McCarty to arrange a meeting for him with the sheriff right away. On this occasion McCarty returned the $100 which Grange had previously given him for the sheriff, with the comment that if Grange wanted to pay the sheriff to do it himself. The meeting so arranged by

McCarty took place on the river road. Both the sheriff and Grange drove there, left their cars and then stood talking. In this conversation Grange reported to the sheriff, among other things, that there were about 158 slot machines in the county. He handed the sheriff a paper containing two lists prepared by Griffin, one of ''our'' machines and the other of Les Gobel's. This list was admitted in evidence as People's Exhibit 5. Grange also told the sheriff it would be a good idea to make a token raid before the meeting in Los Angeles on June 7th. Grange suggested that the sheriff pick up one of ''our'' machines at Sutton's which was breaking down and causing trouble. Grange also told the sheriff there was not enough in the business for everbody, that he thought the state was going to pull out, but that the sheriff did not have to worry because he would not be interfered with by the attorney general's office. Just prior to leaving, Grange opened the left-hand door of the sheriff's car and put an envelope on the seat and said, ''Here's something more for you.'' The envelope was sealed and contained $300 in currency. This sum included the $100 returned by McCarty. Grange told the sheriff he had given $100 to McCarty for the sheriff but that McCarty had returned it. The $300 was all in currency, $20 bills, and was offered in evidence as People's Exhibit 7.

Grange then went back to the Palace Hotel and talked to Mulligan and Griffin. He told them about the $100 which was to be paid to Deputy Sheriff White, and then got the money and went to White's home on the same day and paid the $100 to White. This money was also in an envelope and consisted of five $20 bills, introduced in evidence as People's Exhibit 8. White took the money to the sheriff's office and showed the bills to Deputy Sheriff Bartolomie. After giving this money to White, Grange returned to the Palace Hotel and reported to Mulligan what had happened.

In the financial statement of slot machine operations for the first part of June there was an entry of expenditures entitled ''Podok'' in the sum of $300.

On June 5th, pursuant to Grange's suggestion, a machine was seized by the sheriff's office in each of the following locations: Sutton's, Tanoak, Jeff's Rancho, and Booneville. Gray testified that they had replaced the machine at Sutton's with an old, worn-out one in anticipation of the proposed raid. This was also verified by John Sutton, the operator, and by Deputy Sheriff Bartolomie, who seized an old battered machine

at Sutton's. A week later a new machine, to wit, a big console job, was moved into Sutton's in place of the old one that had been seized.

On June 7th Gray purchased a cashier's check in the sum of $150 which he either sent to appellant Mulligan or gave to appellant Griffin to mail. This money was also taken out of the business by Gray at the direction of Griffin and corresponded with an item of "Podok" in the records of the business.

On June 7th Sheriff Broaddus attended the meeting in Los Angeles and made a short report on slot machines in his county, in accordance with Grange's instructions. Upon returning from the attorney general's meeting, Sheriff Broaddus organized raids and seized slot machines in various parts of the county. Grange was arrested and the slot machines at Lane's Flat were seized. Appellant Griffin was also arrested, and on being questioned said, first, that he had no connection with slot machines and that he was only a mechanic. The following morning he admitted to Deputy Sheriffs White and Bartolomie that he was a partner in the slot machine business, and that he was a part owner of the machines, and that he and Gray owned the machines together.

On June 13th, at San Diego, appellant Caddel was present at a meeting of the Crime Commission. He was asked if he knew a man by the name of Mulligan, to which he replied in the affirmative. When asked in regard to what Mulligan was doing, he stated that he would prefer not to tell that before the commission, but would be perfectly willing to tell it to Admiral Standley, President of the Commission, in private. After the meeting was adjourned Caddel informed Admiral Standley that Mr. Mulligan was employed as a "bag man," that is, a pay-off man, one who carries funds and makes the pay-off.

It is insisted with much earnestness by all the appellants that the evidence above set forth was insufficient to warrant the convictions or to support the verdicts, the principal contention being that it was based mainly upon the testimony of accomplices. It is urged by appellants that the evidence was either not corroborated at all by independent evidence, or at least was insufficiently corroborated. The heaviest attack is made upon the testimony of Grange and Gray who were accomplices as a matter of law and who, in the words of appellants, "bartered their testimony for their freedom." It is also urged that the witness, Paul McCarty, and even Sheriff Broad-

dus himself, were accomplices and that their testimony required corroboration.

Inasmuch as this latter point has an important bearing on the main proposition of the insufficiency of the evidence and of corroboration of accomplices, it seems proper to consider it first. As was noted above, McCarty was indicted along with the other defendants, but during the course of the trial, upon application of the district attorney, the trial court directed that McCarty be discharged in order to make him a witness for the People. In doing so, the trial judge remarked that he had grave doubts as to whether any case had been proven against McCarty and that it was his belief that if the prosecution were to rest at that time an advised verdict probably would be in order.

When McCarty was sworn as a witness he testified unequivocally that he was baiting a trap for Grange on behalf of the sheriff. There is evidence in the record that supports this declaration. When McCarty was first contacted by Grange, and the illegal scheme unfolded, McCarty refused to believe the sheriff would be a party to it. He went to see the sheriff and had a conversation with him and received certain instructions. The conversation between the sheriff and McCarty was, after the action had been dismissed as to McCarty, stricken from the record. However, in the light of subsequent events, the jury might properly have inferred that the sheriff had concurred in a course of action to be pursued by McCarty for the purpose of detection and prosecution of the perpetrators. (*People* v. *Squires*, 99 Cal. 327 [33 P. 1092].) This is borne out by the following facts: that McCarty and the sheriff kept in touch with each other during the course of the conspiracy, and on one occasion met in San Francisco to discuss it; that McCarty made no effort to bring any slot machine operators into the scheme as proposed by Grange nor collected any money from them for pay-off; that he refused to pay the $100 given to him by Grange to be paid to the sheriff as a bribe, stating to Grange, ''If you want to pay the sheriff, pay him yourself''; that it was his intention at the request of the sheriff to find out whether or not Grange was trying to use a pay-off to him and start some organized vice of some kind at Lane's Flat, and whether or not the attorney general was mixed up in this pay-off; that he wanted Grange to give him some proof that Grange had connections with the attorney general's office which had not been furnished, and that he was baiting a trap; that on the occasion that he paid the money to Griffin, Mc-

Carty was on his way to Lane's Flat in order that he might see the man represented to be from the attorney general's office.

The rule is well established that one who, under the direction of an officer of the law, feigns complicity in the commission of a crime merely for the purpose of detecting or prosecuting the perpetrator is not an accomplice and his testimony is not subject to the limitations contained in section 1111 of the Penal Code relating to corroboration. (*People* v. *Bolanger*, 71 Cal. 17 [11 P. 799] ; *People* v. *Keseling*, 35 Cal.App. 501 [170 P. 627] ; *People* v. *Heusers*, 58 Cal.App. 103 [207 P. 908] ; *People* v. *Lanzit*, 70 Cal.App. 498 [233 P. 816] ; *People* v. *Calvert*, 93 Cal.App. 568 [269 P. 969] ; *People* v. *Lombard*, 131 Cal.App. 525 [21 P.2d 955] ; *People* v. *Fitzgerald*, 14 Cal.App.2d 180 [58 P.2d 718] ; *People* v. *Buyle*, 20 Cal.App. 2d 650 [68 P.2d 268] ; *People* v. *Grijalva*, 48 Cal.App.2d 690 [121 P.2d 32] ; *People* v. *Hicks*, 62 Cal.App.2d 859 [145 P.2d 689].) This is predicated upon the theory that those who originate and propose a criminal design may not escape conviction merely by reason of the fact that a trap was laid for them or that they were facilitated in the execution of their unlawful enterprises by an officer of the law who acted for the purpose of detecting them. (*People* v. *Caiazza*, 61 Cal. App. 505 [215 P. 80] ; *People* v. *Lanzit, supra.*)

It is settled law that if there is a disputed question of fact as to whether a witness was or was not an accomplice, the jury must decide. (*People* v. *Kraker*, 72 Cal. 459 [14 P. 196, 1 Am.St.Rep. 65] ; *People* v. *Sansome*, 98 Cal. 235 [33 P. 202] ; *People* v. *Demera*, 64 Cal.App. 121 [220 P. 673] ; *People* v. *Rous*, 118 Cal.App. 534 [5 P.2d 470] ; *People* v. *Featherstone*, 67 Cal.App.2d 793 [155 P.2d 685].) Likewise, it is for the jury to determine, when the evidence is conflicting, whether a witness was an actual or a feigned accomplice. (*People* v. *Bolanger, supra*; *People* v. *Spaulding*, 81 Cal.App. 615 [254 P. 614].) As pointed out in *People* v. *Gibbs*, 87 Cal. App. 177 [261 P. 1057], an accomplice usually comes upon the stand admitting his complicity in the commission of the offense. But where complicity is denied it becomes a question for the jury when the facts are disputed or susceptible of different inferences.

In view of these rules it is our conclusion that the question of whether or not McCarty or Sheriff Broaddus were merely feigning complicity in the offenses charged in order to detect and prosecute the perpetrators thereof was properly left to the jury for determination.

The jury was given the definition of an accomplice and was instructed upon the rules in relation to the testimony of accomplices. It was further instructed as a matter of law that witnesses Gray and Grange were accomplices. On the subject of feigned complicity the trial court gave the jury the following instruction: "One who under the direction of an officer of the law or of any other person or upon his own initiative and without criminal intent feigns complicity in the commission of crime merely for the purpose of determining the perpetrator thereof with a view of prosecution for the offense is not an accomplice in law, and his testimony need not be corroborated." Appellants contend that the effect of this instruction was to take the question away from the jury and inform them that McCarty was not an accomplice. We do not so construe it. The trial court specifically instructed the jury that as to any witness in the case, other than Gray or Grange, it was for them to determine from all of the testimony and circumstances as shown by the evidence whether or not such witness was an accomplice. The determination was thus left to the jury, and no error was committed by the trial court in giving to the jury a definition of feigned accomplices. Under the evidence of the case it was proper for the trial court so to instruct. Consequently, any inference of the complicity of McCarty and Broaddus deducible from their acts and conduct having been resolved adversely by the jury, it must be held that such a finding is conclusive on appeal, and that therefore their testimony need not have been corroborated pursuant to the provisions of section 1111 of the Penal Code. (*People* v. *Gibbs, supra*; *People* v. *Spaulding, supra*.)

We will now proceed to the main issue of appellants' contentions, namely, that the evidence was insufficient to support the convictions. Particular emphasis is placed by them upon a method adopted by some of the decisions in testing the sufficiency of evidence corroborative of the testimony of an accomplice. This method was first announced in *People* v. *Morton*, 139 Cal. 719, 724 [73 P. 609]; wherein the following language from *Welden* v. *State*, 10 Tex.App. 400, was quoted: "We suggest this mode as a proper test: eliminate from the case the evidence of the accomplice, and then examine the evidence of the other witness or witnesses with the view to ascertain if there be inculpatory evidence—evidence tending to connect the defendant with the offense. If there is, the accomplice is corroborated; if there is no *inculpatory* evidence, there is

no corroboration, though the accomplice may be corroborated in regard to any number of facts sworn to by him.''

Appellants rely strongly upon the case of *People* v. *Reingold,* 87 Cal.App.2d 382 [197 P.2d 175], wherein the test above quoted was employed. In applying it to the evidence the court said, on page 393: ''. . . the corroboration is not sufficient if it *requires interpretation and direction* to be furnished by the accomplice's testimony to give it value; second, that the corroborative evidence to be sufficient and of the required *substantial* value *must tend directly and immediately* to connect the defendant with the offense charged against him; and, third, that the corroborative evidence is insufficient when it merely casts a grave suspicion upon the accused.''

The statutory law on the subject is embraced by section 1111 of the Penal Code. This section was enacted in the year 1872 and amended only twice subsequently. In its original form it read: ''A conviction can not be had on the testimony of an accomplice, unless he is corroborated by other evidence which in itself, and without the aid of the testimony of the accomplice, tends to connect the defendant with the commission of the offense; and the corroboration is not sufficient, if it merely shows the commission of the offense, or the circumstances thereof.''

In 1911 the section was amended to read as follows: ''A conviction can not be had upon the testimony of an accomplice, unless he be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.''

By this amendment the Legislature saw fit to delete from the section the words ''by other evidence which in itself, and without the aid of the testimony of the accomplice.''

In 1915 another paragraph was added, as follows: ''An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given.''

The statutory law has thus remained relatively constant throughout a considerable period of time. In applying it to the facts of particular cases and in evaluating the degree of corroboration required, the courts have announced certain rules as follows:

It is not necessary that the corroborative evidence prove independently either that the defendant is guilty of the

offense or that he is guilty beyond a reasonable doubt. (*People* v. *Ames*, 39 Cal. 403; *People* v. *Rose*, 42 Cal.App. 540 [183 P. 874]; *People* v. *Blunkall*, 31 Cal.App. 778 [161 P. 997]; *People* v. *Thompson*, 16 Cal.App. 748 [117 P. 1033]; *People* v. *Leavens*, 12 Cal.App. 178 [106 P. 1103]; *People* v. *Melone*, 71 Cal.App.2d 291 [162 P.2d 505]; *People* v. *Baskins*, 72 Cal.App.2d 728 [165 P.2d 510].) If this were not true and if it were required that a complete case for the prosecution be established without reference to the testimony of the accomplice, there would then be no occasion to offer the accomplice as a witness.

Sufficient corroboration may be furnished by the defendant's own testimony (*People* v. *Sullivan*, 144 Cal. 471 [77 P. 1000]; *People* v. *Watson*, 21 Cal.App. 692 [132 P. 836]; *People* v. *Bunkers*, 2 Cal.App. 197 [84 P. 364, 370]; *People* v. *Baba*, 101 Cal.App. 723 [282 P. 403]; *People* v. *King*, 30 Cal.App.2d 185 [85 P.2d 928]; *People* v. *White*, 48 Cal.App.2d 90 [119 P.2d 383]; *People* v. *Wilson*, 25 Cal.2d 341 [153 P.2d 720]), or by admissions or confessions made by him (*People* v. *Richardson*, 161 Cal. 552 [120 P. 20]; *People* v. *Davis*, 135 Cal. 162 [67 P. 59]; *People* v. *Zimmerman*, 65 Cal. 307 [4 P. 20]; *People* v. *Cleveland*, 49 Cal. 577), or by silence in the face of an accusatory statement (*People* v. *Collins*, 4 Cal. App.2d 86 [40 P.2d 542]).

The entire conduct of the parties, their relationship, acts, and conduct during and after the crime, may be taken into consideration by the jury in determining the sufficiency of the corroboration. (*People* v. *King*, 33 Cal.App.2d 538 [92 P.2d 510]; *People* v. *Ross*, 46 Cal.App.2d 385 [116 P.2d 81]; *People* v. *Willmurth*, 77 Cal.App.2d 605 [176 P.2d 102]; *People* v. *Mazzola*, 99 Cal.App. 682 [279 P. 211]; *People* v. *Wiley*, 33 Cal.App.2d 424 [91 P.2d 907]; *People* v. *Rice*, 29 Cal.App.2d 614 [85 P.2d 215]; *People* v. *Payton*, 36 Cal. App.2d 41 [96 P.2d 991]; *People* v. *Garrison*, 80 Cal.App.2d 458 [181 P.2d 738].)

If the corroboration is inculpatory it is not essential that it extend to all of the elements of the offense, nor to every fact and detail included in the testimony of the accomplices. (*People* v. *Black*, 45 Cal.App.2d 87 [113 P.2d 746]; *People* v. *Andrew*, 43 Cal.App.2d 126 [110 P.2d 459]; *People* v. *King*, 30 Cal.App.2d 185 [85 P.2d 928]; *People* v. *Martinez*, 19 Cal.App.2d 599 [66 P.2d 161]; *People* v. *Whittaker*, 18 Cal. App.2d 396 [63 P.2d 1202]; *People* v. *Briley*, 9 Cal.App.2d

84 [48 P.2d 734]; *People* v. *Tinnin,* 136 Cal.App. 301 [28 P.2d 951]; *People* v. *Baillie,* 133 Cal.App. 508 [24 P.2d 528]; *People* v. *Collier,* 111 Cal.App. 215 [295 P. 898]; *People* v. *Baba,* 101 Cal.App. 723 [282 P. 403]; *People* v. *Negra,* 208 Cal. 64 [280 P. 354]; *People* v. *Frazer,* 80 Cal.App. 464 [252 P. 633]; *People* v. *Taylor,* 70 Cal.App. 239 [232 P. 998]; *People* v. *Kelly,* 69 Cal.App. 558 [231 P. 767]; *People* v. *Yeager,* 194 Cal. 452 [229 P. 40]; *People* v. *Wilson,* 25 Cal.2d 341 [153 P.2d 720]; *People* v. *Harper,* 25 Cal.2d 862 [156 P.2d 249]; *People* v. *Malone,* 82 Cal.App.2d 54 [185 P.2d 870].)

Conversely, such evidence is sufficient if it tends in some slight degree, at least, to implicate the defendant. It need not be strong. (*People* v. *Kelly, supra;* *People* v. *Follette,* 74 Cal.App. 178 [240 P. 502]; *People* v. *McNett,* 80 Cal.App. 81 [251 P. 688]; *People* v. *Negra, supra;* *People* v. *Linde,* 131 Cal.App. 12 [20 P.2d 704]; *People* v. *Tinnin, supra;* *People* v. *Andrew, supra;* *People* v. *Wilson, supra.*)

The testimony of an accomplice need not be corroborated by direct evidence, or, stated in another way: Circumstantial evidence suffices for the purpose of corroboration. (*People* v. *McNett, supra;* *People* v. *Frazer, supra;* *People* v. *Blunkall, supra;* *People* v. *Nikolich,* 93 Cal.App. 356 [269 P. 721]; *People* v. *Allen,* 95 Cal.App. 60 [272 P. 349]; *People* v. *Negra, supra;* *People* v. *Entriken,* 106 Cal.App. 29 [288 P. 788]; *People* v. *Knoth,* 111 Cal.App. 250 [295 P. 577]; *People* v. *Bonner,* 5 Cal.App.2d 314 [42 P.2d 694]; *People* v. *Ross, supra.*)

It is sufficient, even though circumstantial and slight, if the connection of the defendant with the alleged crime may be reasonably inferred from the corroborative evidence. (*People* v. *Whittaker, supra;* *People* v. *Rice, supra;* *People* v. *Payton, supra;* *People* v. *Suter,* 43 Cal.App.2d 444 [111 P.2d 23]; *People* v. *Wilson, supra.*)

The corroborating evidence is sufficient if it connects the defendant with the commission of the crime in such a way as reasonably to satisfy the fact-finding body that the accomplice is telling the truth. (*People* v. *Trujillo,* 32 Cal.2d 105 [194 P.2d 681]; *People* v. *Henderson,* 34 Cal.2d 340 [209 P.2d 785].) In the Trujillo case, *supra,* our Supreme Court said, at page 110: "Such corroboration must create more than a suspicion of guilt, but is sufficient even though it 'be slight and, when standing by itself, entitled to but little consideration.' (*People* v. *Negra,* 208 Cal. 64, 69 [280 P. 354]; *People*

v. *Wilson,* 25 Cal.2d 341, 347 [153 P.2d 720] ; *People* v. *Shaw,*
17 Cal.2d 778, 803 [112 P.2d 241] ; *People* v. *Yeager,* 194 Cal.
452, 473 [229 P. 40].) It is sufficient when the evidence offered
as corroborative tends to connect a defendant with the com-
mission of the crime in such a way as reasonably may satisfy
a jury that the accomplice is telling the truth. It is not nec-
essary that the accomplice be corroborated as to every fact to
which he testifies. If his testimony could be completely proven
by other evidence, there would be no occasion to offer him as
a witness. (*People* v. *Negra, supra*; *People* v. *Yeager, supra.*)
For the same reason, it is not necessary that the independent
evidence be sufficient to establish the defendant's guilt. The
prosecution is not required to single out an isolated fact which
in itself, unrelated to other proven facts, is considered to be
sufficient corroboration. It is the combined and cumulative
weight of the evidence furnished by non-accomplice witnesses
which supplies the test.''

In *People* v. *Henderson, supra,* at page 343, the following
language is used: ''The evidence of inculpatory participation
need not be direct nor extend to every fact and detail. It may
be circumstantial and is sufficient, even though slight, if it tend
to connect the defendant with the commission of the crime.
(*People* v. *Negra,* 208 Cal. 64, 69-70 [280 P. 354] ; *People* v.
*Yeager,* 194 Cal. 452, 473 [229 P. 40].) ''

In the vast majority of the decisions on the subject no indi-
cation is given that the test suggested by *People* v. *Morton,*
*supra,* was used. And this is true of a number of the decisions
on the subject, which have been decided by our district courts
of appeal subsequent to the *People* v. *Reingold* case, namely,
*People* v. *Holt,* 88 Cal.App.2d 42 [198 P.2d 58] ; *People* v.
*Mastrantuono,* 88 Cal.App.2d 178 [198 P.2d 574] ; *People* v.
*Baker,* 89 Cal.App.2d 503 [201 P.2d 42] ; *People* v. *Anderson,*
90 Cal.App.2d 326 [202 P.2d 1044] ; *People* v. *Fountain,* 91
Cal.App.2d 158 [204 P.2d 639] ; *People* v. *Colton,* 92 Cal.
App.2d 704 [207 P.2d 890] ; *People* v. *Duarte,* 96 Cal.App.2d
661 [216 P.2d 81].

The word ''corroboration'' in its etymological sense
denotes ''a strengthening or confirming.'' (Webster's New
International Dictionary, Second Edition.) It is essentially
a relative term and refers to some antecedent which it is said
to strengthen or fortify. The jury in determining the question
of corroboration must obviously compare the residue of the
other evidence with the accomplice's testimony, in order to

ascertain the truthfulness of the latter, and in this regard the corroborative evidence must do more than merely raise a suspicion of guilt, even a grave suspicion, in the jury's mind. It must reasonably satisfy the jury that the accomplice is telling the truth. (*People* v. *Trujillo, supra*; *People* v. *Henderson, supra.*)

In view of these more recent decisions of the Supreme Court we conclude that the test suggested in *People* v. *Morton, supra,* and followed by *People* v. *Reingold, supra,* is not an exclusive method of analyzing the sufficiency of evidence corroborative of the testimony of an accomplice. We conclude further that such evidence may be held sufficient if it connect the defendant with the crime in such a way as reasonably to satisfy the fact-finding body that the accomplice is telling the truth.

Under our system of jurisprudence it is the peculiar and exclusive province of the trier of facts, either jury or judge, to decide upon the credibility of the witness, and the weight and effect of his testimony. This elementary rule is equally true when an accomplice is offered as a witness (*People* v. *Curlee,* 53 Cal. 604; *People* v. *Gibson,* 53 Cal. 601; *People* v. *Hoosier,* 24 Cal.App. 746 [142 P. 514]), with the restriction, however, that the jury's discretion is not arbitrary and that it may not accept the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense. However, the law does not forbid the jury to believe the accomplice, but does require that there be other evidence which measures up to the requirement tending to connect the defendant with the crime charged. If there be such evidence, then the testimony of the accomplice is to be considered by the jurors as any other testimony, and given such weight as they may conclude that it is entitled to. (8 Cal.Jur., § 340, p. 281; *People* v. *Flood,* 41 Cal.App. 373 [182 P. 766] ; *People* v. *Hoosier, supra; People* v. *Negra, supra; People* v. *Hanks,* 35 Cal.App.2d 290 [95 P.2d 478].)

The weight to be given to the testimony of an accomplice as well as the sufficiency and weight of the corroboration is for the jury's determination. (*People* v. *Trujillo, supra; People* v. *Pruitt,* 55 Cal.App.2d 272 [130 P.2d 767] ; *People* v. *Lindley,* 26 Cal.2d 780 [161 P.2d 227] ; *People* v. *Newland,* 15 Cal.2d 678 [104 P.2d 778].) Before a verdict of a jury can be set aside upon appeal upon the ground of insufficiency of the evidence to support it, it must be made clearly to appear that upon no hypothesis whatever is there substantial evidence

sufficient to support the conclusion of the trial court. (*People v. King,* 40 Cal.App.2d 137 [104 P.2d 521] ; *People v. Tedesco,* 1 Cal.2d 211 [34 P.2d 467] ; *People v. Ramsey,* 83 Cal.App.2d 707 [189 P.2d 802] ; *People v. Parker,* 80 Cal.App.2d 128 [181 P.2d 16].)

As said in *People v. Henderson,* 34 Cal.2d 340, at page 346 [209 P.2d 785] : ''When as in the present record it is discovered that there is testimony aside from that of the accomplice which tends to connect the defendant with the commission of the crime, the function of the appellate court is performed. Questions of the weight of the evidence and the credibility of the witnesses are for the trial court, and since the circumstances reasonably justify the finding of guilt, an opposing view that they also may be reconciled with innocence will not warrant interference with the judgment on appeal. (*People v. Newland,* 15 Cal.2d 678, 681 [104 P.2d 778], and cases cited.)''

We are satisfied, after reading the entire transcript of testimony, that, measured by the rules last above stated, there is sufficient evidence to corroborate the testimony of the accomplices. The case was tried upon the theory of conspiracy, and in support thereof the testimony of a number of witnesses who were clearly not accomplices was introduced, as well as a large number of documentary exhibits. We have already in the statement of facts summarized some of the circumstances corroborating the testimony of the accomplices. Inasmuch as the sufficiency of this other evidence is so severely challenged we will again, at the risk of repetition, allude to it.

The evidence from nonaccomplice sources so far as appellant Griffin is concerned consists of, first, his own admission that he was a partner in the slot machine business, that he was a part owner of the machines, and that he and Gray owned them together. Testimony from witnesses who were not accomplices disclosed the following : that on one occasion appellant Griffin and Gray were transporting slot machines in a truck and were intercepted on the highway by two deputy sheriffs; that appellant and Gray unsuccessfully solicited Edward E. Lane to put slot machines in the latter's resort at Riverdale; that appellant came to the resort of Austin I. Stinson three or four different times, and once approached Stinson about putting in slot machines; that one Charles Strait saw slot machines at Sutton's resort and heard them pay off, and on two occasions saw Griffin and Gray repairing

slot machines there; that in 1948, sometime before June, he saw both men carrying out machines which they said would not work; that one Evelyn McMahon saw Griffin come to a resort known as Peggy's Place on several occasions, and saw Griffin working on the slot machines with tools; that one Joe Whalen, an employee in the bar at Grundy's, saw Griffin repairing slot machines in that place and saw him remove the money from them.

Evidence of Griffin's trip to Los Angeles and the purchase of slot machines from the California Games Company was developed by nonaccomplice testimony. As has already been stated, Griffin took delivery of the four machines purchased, and the three or four machines which had been renovated, in a truck and departed with them. Gasoline purchases on the trip were charged to a credit card belonging to Lane's Flat. Two additional slot machines purchased by Griffin were ordered to be shipped to Robert Gray in Mendocino County.

On May 5, 1948, as testified by witness McCarty, when the latter was on his way to Lane's Flat to meet the man represented to be from the attorney general's office for the May pay-off, he was stopped on the road by Griffin. Griffin handed him an envelope from Grange in which was a list and a $100 bill intended as a bribe for Sheriff Broaddus. As was related above, McCarty refused to accept this bill, but in turn stated that he had some money and a list for payment. Griffin took these and told McCarty he would give them to Grange.

Documentary evidence admitted in evidence in corroboration of testimony of the accomplices Gray and Grange was the following: a $500 cashier's check purchased by Melba Wesson of the California Games Company from the Security First National Bank of Los Angeles and payable to W. A. Griffin; this check was endorsed "W. A. Griffin" and "R. A. Gray"; Gray testified that this money was used to take delivery of slot machines which were shipped C.O.D. American Railway Express; the express tag evidencing the shipment was also admitted into evidence; a second cashier's check in the sum of $1,500, purchased by Melba Wesson of the California Games Company with money furnished by appellant Griffin, which check was made payable to Fred Grange, and bears the endorsement "Fred S. Grange"; Grange testified that he was paid this sum in reimbursement for payments made to the Morris Plan on Gray's contract for slot machines.

This evidence amply corroborates the testimony of accomplices Gray and Grange that an agreement was made and

carried into execution to operate slot machines in Mendocino County and to obtain protection therefor by a system of bribery. It further directly inculpates appellant Griffin as a member and active participant in the conspiracies. It also corroborates the testimony of numerous other resort owners that Gray or Griffin or both of them together had solicited the resort owners to put in slot machines, that the machines were placed on location in their respective resorts and put in operation, and that Griffin or Gray or both collected the proceeds thereof and paid to the location owners a percentage thereof.

The evidence being corroborative of the testimony of Gray, it also corroborates certain documentary evidence which consisted generally of records kept by Gray. These exhibits comprised statements of income and disbursements, collection reports and records of the slot machine business. The "statements" show the names of various resorts in Mendocino County, and opposite these names certain items indicating money received as of a certain date. Under the head of expenses are also sundry items, with the date. For example, in People's Exhibit 60, entitled "Statement," some of the expenses listed for the month of May are as follows:

| May | Expenses | Expenses | Loads |
|-----|----------|----------|-------|
| 15 | Tom Grundy—Load (25¢) .............. | | $40.00 |
| 17 | Office—Loads—5¢-25¢ Slots ........... | | 40.00 |
| 18 | Willie—Drawing .....................$20.00 | | |
| 18 | Bob—Drawing ....................... 10.00 | | |
| 20 | Willie—Phone call S. F.-L. A. ......... 11.00 | | |
| 21 | Willie—Drawing .................... 20.00 | | |
| 21 | Bob—Drawing ....................... 20.00 | | |
| 23 | Bob—Ent. Exp. ...................... 13.00 | | |
| 23 | Willie—New Truck Exp. ..............$ 5.00 | | |
| 25 | Load for Piercy Machine ............. | | $40.00 |
| 25 | Bob—S. F. Trip Exp. ................ 15.00 | | |
| 25 | Willie—Drawing .................... 10.00 | | |
| 25 | Bob—Drawing ....................... 10.00 | | |
| 26 | Devoy—Load ........................ | | 30.00 |
| 27 | Bob—Drawing ....................... 20.00 | | |
| 28 | Willie—Expense .................... 5.00 | | |
| 30 | Willie—Mach. Rep. & Exp. ............ 5.00 | | |
| 31 | Willie—Exp. ........................ 10.00 | | |
| 31 | Bob—Exp. .......................... 10.00 | | |
| 31 | Express charges—challengers & springs. 9.10 | | |
| 31 | Curley—Work on Machines ........... 20.00 | | |
| 31 | Lane's Flat—Load .................. | | 10.00 |
| 31 | Morris Plan—Payment 5/8 .........551.64 | | |

This same exhibit shows on the top or receipts portion of the statement the following items as "Ins.":

| | | | |
|---|---|---|---|
| 18 | Hollow Tree | to 5/15 | $40.00 |
| 20 | Grundy's—Tom | to 5/15 | 20.00 |
| 21 | Lane's | to 5/15 | 40.00 |

In this connection six of the resorts listed on this exhibit were found on June 16th by Deputy Sheriff Crawford to have had slot machines set up for automatic pay-off. Other records of the business received in evidence were certain collection reports. These consisted of regular printed forms showing, among other things, "Total Amount in Machine," "Less Expense," "Net Amount to Divide," "Merchant's Share," "Balance Due Operator." People's Exhibit 1 in evidence consists of three of these collection reports, two of which are signed by "Bob" as collector, and the other signed by "W.A.G."; this latter slip shows the "Net Amount to Divide" $50, $20 of which was to be the "Merchant's Share," and $30 "Balance Due Operator," or indicating a division of profits on a 60-40 basis.

Another exhibit admitted in evidence was the contract co-signed by Fred Grange to the Morris Plan. It discloses that the monthly payment required thereunder was $546.64. The records of the slot machine business show that payments of these installments were made and entered in said records as items of expenditure.

The record shows further that in pursuance of the conspiracies certain declarations were made. After Grange had had the visit and conversation with Sheriff Broaddus described in the statement of facts, wherein the sheriff had told Grange he might talk with McCarty, the evidence disclosed that Grange did go to McCarty again and ask what the deal was. When McCarty reiterated that there was no deal, Grange expressed his disbelief by saying, "Bla, bla, bla." Grange then told McCarty that he (Grange) had personal connections in the state or friends in the attorney general's office who could guarantee immunity from any trouble. But McCarty expressed his doubts concerning Grange's connections, and in order to verify the statement that Grange had been to the sheriff's office McCarty called on the sheriff and received from the sheriff certain instructions.

In a subsequent conversation with McCarty, Grange outlined a plan of pay-off of $10 per week per machine for both the sheriff and the state. Grange said that he would guarantee

that the attorney general's office would not bother them. When McCarty again expressed his doubt of the authenticity of this connection Grange said he could supply the proof in one of two ways, either by having a letter written by the attorney general's office to the sheriff, complaining about a particular place, or he (Grange) would have a man from the attorney general's office call on the sheriff at a prearranged time and just pass the time of day. Also, in this conversation Grange suggested a division of territory for slot machine operations in which McCarty would concede to Grange everything north of Laytonville.

The evidence of these declarations of Grange was given in the testimony of McCarty. The law is well settled that where the evidence is amply sufficient to establish a conspiracy, all statements, acts and declarations by any of the parties, pending the commission of it, and looking toward its consummation, are competent evidence against each and every conspirator. (*People* v. *Ferlin,* 203 Cal. 587 [265 P. 230] ; *People* v. *Collier,* 111 Cal.App. 215 [295 P. 898] ; *People* v. *Stevens,* 78 Cal.App. 395 [248 P. 696] ; *People* v. *Chait,* 69 Cal.App.2d 503 [159 P.2d 445].)

In *People* v. *Black,* 45 Cal.App.2d 87, at page 102 [113 P.2d 746], the court held that there was no error in admitting testimony of the conversations and acts of the conspirators which occurred at a time more than three years prior to the date of the indictment. In so doing the court quoted with approval the following language from *People* v. *Stevens,* 78 Cal.App. 395, at page 407 [248 P. 696], wherein a conspiracy was likened to a large tree, which, originating in a tiny tendril, requires a long time and persistent nurture to develop into a matured tree :

''In our opinion there is no valid objection to evidence in conspiracy cases which tends to show, step by step, the gradual formation of a criminal concord in the minds of those charged with the illicit combination, merely because the evidence begins at a time long anterior to the wrongful meeting of minds. It is necessary only that the evidence, in all its parts, tends to prove the formation of the conspiracy. In a case in which, it is true, the only issue was as to the identity of one of the alleged parties to a conspiracy, the court said: 'From the nature of the crime itself it is difficult to prove a criminal conspiracy by direct evidence, and such conspiracies are most

always proven by circumstantial and "piecemeal" evidence; and in consideration of this fact in such cases great latitude must of necessity, be given the commonwealth in the production of its evidence' (*Jenkins* v. *Commonwealth*, 167 Ky. 544 [3 A.L.R. 1522, 180 S.W. 961])."

That the above declarations of Grange were in furtherance of the conspiracy to operate slot machines, and looking toward its consummation, can hardly be questioned. The obtaining of a virtual concession for such operations free from interference by law enforcement officers would obviously be of prime importance to the owners and operators of such gambling devices.

We will next consider the evidence corroborative of accomplices' testimony that appellant Mulligan was also a member of the conspiracies. Grange testified that he saw Mulligan either at Lane's Flat or at San Francisco on an average of once or twice a month during the time of the conspiracy. There was evidence introduced from which the jury could reasonably have inferred, other than from the testimony of accomplices, that appellant Mulligan, a resident of Los Angeles, was in northern California on the following occasions: 1. November 20, 1947, at Lane's Flat; 2. January 4, 1948, San Francisco; 3. January 23, San Francisco; 4. January 29, San Francisco; 5. February 14, San Francisco; 6. February 16, Ukiah; 7. February 17, San Francisco; 8. February 28, San Francisco; 9. March 6, San Francisco; 10. April 5, Ukiah; 11. April 6, San Francisco; 12. April 13, San Francisco; 13. April 28, San Francisco; 14. April 29, Lane's Flat; 15. June 3, Ukiah. This evidence consisted mainly of records from the Palace Hotel of San Francisco and the Palace Hotel of Ukiah, as well as the records of various airline companies. In addition, evidence was introduced showing the following long distance calls from Mulligan's home in Los Angeles to Lane's Flat, Mendocino County: February 18, 1948, February 26, February 27, March 12, March 19, April 2, April 3, April 8, April 10, and May 22. There were also the following long distance calls from Lane's Flat to Mulligan's home in Los Angeles, to wit: March 5, March 12, March 28; and on May 10th a long distance call from the pay station at Garberville to Mulligan's home in Los Angeles.

Appellant Mulligan did not take the stand to testify, and therefore offered no explanation of these telephone calls from one end of the state to the other, nor did he deny the significance of them as testified to by accomplice Grange. Cir-

cumstantially, these calls have a corroborative value which the jury could properly have inferred from them. For example, on the occasion when Grange testified that he met Mulligan and Caddel at the San Francisco airport, documentary evidence introduced indicated that, traveling by plane from different parts of the state, Caddel from Los Angeles and Mulligan from Ukiah, their itineraries were so timed that their arrivals converged at the San Francisco airport at the time Grange said he met them there. Again, when Grange and Gray testified that they had met by pre-arranged agreement at the Palace Hotel at San Francisco to discuss the purchase and sale of Gray's interest in slot machines, documentary evidence showed that Grange and Griffin had registered at the Palace Hotel on February 29th, and that Mulligan was already there, having checked in at 12:22 p. m. on February 28th; that on the two days previous to the 28th there had been long distance telephone calls from Mulligan's home in Los Angeles to Lane's Flat; that Mulligan and Grange and Griffin all occupied rooms on the eighth floor of the Palace Hotel, and that from Mulligan's room there was a telephone call shown to the residence of Gray.

On the occasion of Griffin's trip to Los Angeles, when he purchased the slot machines from the California Games Company, the evidence showed that on the day before his departure there was a long distance call at 7:55 in the morning from Mulligan's home in Los Angeles to Lane's Flat, and on the same day at 8:16 p. m. there was a call from Lane's Flat to Mulligan's home. When Griffin was at the California Games Company at Los Angeles he was seen in the company of Mulligan and the two were talking. Thomas Wall, the manager of the retail slot machine company which sold the machines to Griffin, had known Mulligan for 16 years. The record also shows long distance calls between Mulligan's room at the Palace at San Francisco and Parkway 2125, Los Angeles, the telephone number of the California Games Company.

When Grange testified that Mulligan came to Ukiah on April 5th for the first pay-off and occupied a room at the Palace Hotel, registering under a fictitious name, and was met there by Grange and Griffin, circumstantial evidence which could have been considered by the jury in support thereof showed the following: That on April 2d and 3d long distance calls had been made from Mulligan's home in Los Angeles to Lane's Flat; that on April 4th a reservation for

airplane passage had been made from Los Angeles to San Francisco and thence to Ukiah for a "Mulligan"; that on account of weather conditions the flight from San Francisco to Ukiah was cancelled, as was likewise the one on the 5th; that on April 5th a man registered in room 228 of the Palace Hotel at Ukiah, under the name of "Miller," from Los Angeles; that on this same day Grange looked up McCarty and declared to him, "The man is here for the money," and "wants a list of your locations." The question then arose about the free-play machines, and Grange left McCarty to consult the "man." When he returned a list was made out showing the location of the machines in two different columns. Grange testified that Griffin made a copy of this list. A copy of this list, on the stationery of the Palace Hotel in Ukiah, was admitted in evidence. The record also shows that on April 5th a telephone call was placed from Lane's Flat to the Palace Hotel in Ukiah, asking for either Grange or Griffin, and that Griffin answered the call; also that on the evening of April 5th a call was placed from room 228 occupied by "Miller" to Caddel's home in Los Angeles.

On April 29th, according to Grange's testimony, Mulligan showed up at Lane's Flat and told Grange that Caddel was stopping off to see the sheriff. Regarding this the following corroborative evidence was adduced: On the day before, Mulligan and Caddel, with their respective wives, had registered at the Palace Hotel in San Francisco within minutes of each other. On the 29th Mulligan and his wife had checked out of the hotel at the early hour of 6:39 a. m. On the same morning, at 11:15 a. m., Caddel called at the sheriff's office and had the conversation with Sheriff Broaddus which has already been related. On the following morning Grange contacted Sheriff Broaddus at the latter's home, and, after first speaking of Caddel's visit, committed the act of bribery charged in Count Three of the indictment, by leaving with the sheriff an envelope which contained currency.

Grange testified that after giving the bribe to Sheriff Broaddus, he (Grange) picked up Mulligan, and on the way back to Lane's Flat they stopped at Tanoak Park. This latter fact was corroborated by Deputy Sheriff Hollingsworth who saw Grange and Mulligan together at Tanoak Park on the occasion and who identified the automobile in which they were riding as a late model two-toned blue Oldsmobile, license No. 5-4181. Later in the same day Hollingsworth saw Mulligan and Grange together again at Piercy's.

In the records of the slot machine revenue and expenses above referred to in connection with the conspiracy, there is an entry on the 30th of April of $250 entitled "Podok." This amount exactly corresponds to the amount testified to by the sheriff as contained in the envelope given him by Grange. That testimony could have been considered by the jury as corroborative of said entry, and it reasonably could have inferred therefrom that "Podok" meant "pay-off" or protection money.

Grange testified that Mulligan on this trip made another collection on the slot machine operations, namely, the money paid by McCarty to Griffin. Circumstances which the jury might reasonably consider corroborative of the same were the following: McCarty's testimony that he had informed Grange that he would bring the money to Lane's Flat and see the fellow from the attorney general's office, but on the way there was intercepted on the road by Griffin, and that he had paid Griffin the money. Deputy Sheriff Hollingsworth witnessed this scene at a distance and testified that he saw Griffin and McCarty talking together on the occasion of the transfer of this money. Later on the same day Hollingsworth saw Griffin talking to Mulligan in the Oldsmobile automobile, and on this occasion Griffin presently got out of the car and came over to talk to Hollingsworth. Griffin said the man with him was a friend from Los Angeles who was retired after thirty years on the police force. On the same occasion Hollingsworth also saw Gray standing out in front of the car talking to a woman.

On May 4th Mulligan was seen by Chief of Police Griffin in Willits, driving the Oldsmobile car, with a woman passenger. The records of the Palace Hotel in San Francisco reveal that on May 4th, at 7:13 p. m., Mulligan and his wife registered and were assigned to room 7093; that shortly thereafter a long distance telephone call was placed from Mulligan's room to Caddel's home in Los Angeles.

Grange testified that on the 3d of June Mulligan returned to Ukiah, again registering under a fictitious name at the Palace Hotel. The evidence showed that on this date a man registered at the hotel under the name of "Wilson" and was assigned room 239. After arriving there the records show that a call from this room was placed to Mulligan's home in Los Angeles. On this same day Grange contacted McCarty for the June pay-off, but with negative results. McCarty told him he could not get the operators to pay up. Grange then asked

McCarty to arrange a meeting with the sheriff right away. This was done by McCarty, as related above, and Grange met with the sheriff on the river road, and this was the occasion for the second bribe, charged in Count Four of the indictment.

In the conversation with the sheriff, Grange handed to the sheriff a paper containing two lists, one of "our" machines and one of Les Gobel's. This list was admitted in evidence as People's Exhibit 5. This meeting between the sheriff and Grange was witnessed at a distance by Deputy Sheriff Crawford who took a photograph of it. The $300 in currency given by Grange to the sheriff on that occasion was admitted in evidence as People's Exhibit 7. In the financial records maintained in connection with the conspiracy to operate slot machines, there was an entry of expenditure for the first part of June entitled "Podok" in the sum of $300, corresponding to the amount received by Sheriff Broaddus.

On this same day, to wit, June 3d, the third act of conspiracy, charged in Count Five of the indictment, was committed when Grange went to Deputy Sheriff White's home and handed him an envelope containing five $20 bills, which were also introduced in evidence.

Gray testified that on June 7th he purchased a cashier's check in the sum of $150, which was either sent to appellant Mulligan by him or given to appellant Griffin to mail. The cashier's check was introduced into evidence in this amount, payable to J. E. Mulligan and endorsed "J. Mulligan." Gray testified that this sum was taken out of slot machine money, and in support thereof there is an entry in the records of the business entitled "Podok $150.00."

The evidence above set forth clearly shows that the conspiracy illegally to operate slot machines in Mendocino County had grown into and was supplemented by a second conspiracy to commit acts of bribery.

We believe from the facts and circumstances above set forth that the jury was reasonably justified in its determination that both appellants Griffin and Mulligan were parties to the conspiracies, and that the jury could reasonably have concluded that the testimony of the accomplices was true, and that appellant Mulligan, in the general concert of action, performed the role of messenger, collector and intermediary.

Now directing our attention to evidence which the jury could have considered in connection with the testimony of accomplices that appellant Caddel was also a member of these conspiracies, it showed first a very close and intimate

relationship between Caddel and appellant Mulligan. They not only visited in each other's homes, but on numerous occasions, when Caddel was in San Francisco on official missions, it so coincided that Mulligan would also be there, and the two would stay at the same hotel. On occasion they occupied the same or adjoining rooms, or, at least, rooms on the same floor. Sometimes they checked in or out of the hotel at approximately the same time. On one occasion Caddell made reservations at the Palace Hotel for Mulligan, and on another they traveled together by plane from San Francisco to Los Angeles, Caddel having made the reservation.

It is of course true that mere association with the perpetrator of a crime is not sufficient to prove a criminal conspiracy. (*Dong Haw* v. *Superior Court*, 81 Cal.App.2d 153 [183 P.2d 724].) An entirely different situation may arise, however, when it is shown that a conspiracy is already in existence and that acts are being committed in furtherance thereof. The evidence here, revealing the conspiracy in Mendocino County and the activity of Messrs. Grange and Gray and appellants Mulligan and Griffin in connection therewith, has already been reviewed. Appellant Caddel's association with appellant Mulligan may now be considered in the light of these existing conspiracies. In January, 1948, when the conspiracy to operate slot machines was getting under way in Mendocino County the records of the Palace Hotel in San Francisco showed that Mulligan and Caddel were there on January 4th and occupied rooms 5028 and 5030, respectively. On January 23d Mulligan registered there again and a long distance telephone call was placed by him to Hempstead 2602, Caddel's residence in Los Angeles. On January 27th Caddel registered at the Palace Hotel, and on the following day a call was placed from Mulligan's home in Los Angeles to the Palace Hotel. Two days later Mulligan was registered in at the Palace Hotel by Caddel.

On February 16th airline records indicate that Caddel had flown from Los Angeles to San Francisco, arriving at the San Francisco airport at 11:10 a. m. Records of the Palace Hotel also show that he did not check in at the hotel until 3:11 p. m. This was the occasion when Grange testified he had met Mulligan and Caddel at the airport. Airline records also indidate that at 4:45 p. m. of the same day Mulligan departed from San Francisco for Los Angeles by plane, and that on the following day he returned to San Francisco and checked in

at the Palace Hotel at 11:11 p. m. The hotel records show that on February 18th Mulligan and Caddel checked out of the hotel at approximately the same time, a reservation having been made by Caddel for two airplane tickets to Los Angeles, the names on the flight reservations being "W. H. Caddel and J. M. Mulligan."

The meeting in San Francisco on February 29th and March 1st between Mulligan, Grange, Griffin and Gray has already been referred to. On February 26th and February 27th there had been long distance telephone calls from Los Angeles, Axminster 2-7904, Mulligan's home, to Lane's Flat. On February 28th Mr. and Mrs. Caddel and Mr. and Mrs. Mulligan registered at the Palace Hotel at exactly the same time, and occupied rooms 8014 and 8023, respectively. Appellant Caddel admitted on the witness stand that he had made the reservations for the Mulligans. On the same day, and only a few hours after their registration, there was a telephone call from Lane's Flat, Mendocino County, to the Palace Hotel at San Francisco. When Grange and Gray arrived on the 29th they were assigned room 8059 on the same floor with Mulligan and Caddel. On the following day Caddel checked out at 10:03 a. m., and on March 2d at 7:15 a. m. a long distance telephone call was placed from Hempstead 2602, appellant Caddel's home in Los Angeles, to Exbrook 2-8600, the Palace Hotel, for Jimmy Mulligan. It will be recalled that the conference on March 1st at the Palace between Mulligan, Grange, Griffin and Gray concerned the buying out of Gray's interest in the slot machines in Mendocino County.

On March 5th there was a collect call from Caddel in Madera to Mulligan in Los Angeles, and on the same day there was a telephone call from Lane's Flat to Mulligan's home in Los Angeles. On March 6th appellant Caddel registered at the Palace Hotel in San Francisco, and on that afternoon appellant Mulligan was checked in and was assigned to room 3032, the same room occupied by appellant Caddel. Mulligan had been previously registered by Caddel, according to hotel records, which also showed both appellants had checked out at 7:03 the following morning. On March 19th at 6:40 p. m. there was a long distance call from Mulligan's home in Los Angeles to Lane's Flat. At 7:04 p. m. there was a long distance call from Caddel's room at the Palace Hotel, San Francisco, to Mulligan's home in Los Angeles.

When Mulligan was in Ukiah for the first pay-off on April 5th, and registered at the Palace Hotel there under the name

of Miller, he said, according to Grange, "I have to call Buck and tell him that everything is all right, because he is very interested to know." Grange heard Mulligan speak to the party on the other end of the line and say, "Everything has gone here as planned. Everything is all right." The records of the telephone company show that on April 5th at 8:01 p.m. a long distance call was completed for room 228 Palace Hotel, Ukiah, by a person named Miller, to Hempstead 2602, Caddel's home in Los Angeles. Further, the records of the Palace Hotel at Ukiah also reveal that a long distance call was made to Los Angeles from the same room and on the same day.

Grange testified that about the 10th of April Mulligan called by telephone and said that the man from the attorney general's office was busy at Santa Cruz and would be a little late. The record shows that on April 8th and 10th there were long distance calls from Mulligan's residence in Los Angeles to Lane's Flat. Two days after this last call appellant Caddel registered at the Palace Hotel in San Francisco, and on the following day Mulligan was checked in, occupying, as usual, a room on the same floor as Caddel. The records show that on this day there was a call from Lane's Flat to the Palace Hotel in San Francisco. On April 14th both Mulligan and Caddel checked out of the hotel, and notations in Caddel's daily operating report for April 14th and 15th reveal that he was in Santa Cruz on said dates, and he testified he remembered the fact of his being there.

Caddel's visit to the sheriff's office on April 29th has already been described, and the fact that on the day preceding appellants Mulligan and Caddel, with their respective wives, had registered at the Palace Hotel in San Francisco at approximately the same time. It also has been noted that on the following morning at 6:39 Mulligan and his wife had checked out of the hotel and proceeded to Lane's Flat and Mulligan informed Grange that he and Caddel had driven from San Francisco in separate cars, and that Caddel was stopping off to see the sheriff. About 11:15 of that morning Caddel appeared unannounced at the sheriff's office and had the brief conversation with the sheriff which has heretofore been related. Caddel's mission to San Francisco on April 28th, according to Walter H. Lentz, Chief Enforcement Officer, Department of Justice, was to conduct an investigation and to procure information regarding gambling, prostitution and vice in Sonoma, Humboldt, Lake and Napa Counties, and no other county; that he (Lentz) had not instructed Caddel

to go to Mendocino County. Caddel, on the witness stand, admitted that his mission was as Lentz had testified, and that he had no business in Mendocino County. On his operative's report for that day there was nothing to indicate the visit to Mendocino County except the initials "Uk" which had been partially erased. Caddel was unable to say whether or not these initials were written by him, nor was he able to explain the attempted erasure. Mr. Lentz testified that "Uk" was in Caddel's handwriting. And finally, when appellant Caddel was questioned before the Crime Commission concerning Mulligan's activities, he stated in private to Admiral Standley that Mulligan was a "bag man," that is, a pay-off man.

Neither appellant Griffin nor Mulligan took the witness stand to testify, and thus did not deny any of the evidence that was admitted against them. Appellant Caddel did testify and denied any part in either the conspiracy to operate slot machines in violation of section 330a of the Penal Code, or to commit acts of bribery. Through his own testimony and that of witnesses called in his defense he sought to prove that his association with appellant Mulligan was purely of a social nature, and that a number of the telephone calls referred to had been made by Mrs. Caddel. In reference to the call from Ukiah on April 5th from "Miller," appellant Caddel denied that he received this call, and introduced evidence that he was on that evening visiting his wife in the Good Samaritan Hospital at Los Angeles. Caddel also denied that he had met Grange at the San Francisco airport on February 16th or at the Palace Hotel in San Francisco on March 1st, or that he ever told Grange that he (Caddel) and Mulligan were partners.

It is true that much of the evidence tending to connect appellant Caddel with the commission of the offenses here was circumstantial. However, it is the rule in this and other jurisdictions that the existence of a conspiracy may be established either by direct testimony of the fact or by circumstantial evidence or by a combination of both. (*People* v. *Gonzales*, 20 Cal.2d 165 [124 P.2d 44]; *People* v. *Eldridge*, 147 Cal. 782 [82 P. 442]; *People* v. *Donnolly*, 143 Cal. 394 [77 P. 177]; *People* v. *Lawrence*, 143 Cal. 148 [76 P. 893, 68 L.R.A. 193]; *People* v. *Moran*, 144 Cal. 48 [77 P. 777]; *People* v. *Rodley*, 131 Cal. 240 [63 P. 351]; *People* v. *Gregory*, 120 Cal. 16 [52 P. 41]; *People* v. *Bentley*, 75 Cal. 407 [17 P. 436]; *People* v. *Stokes*, 5 Cal.App. 205 [89 P. 997]; *People* v. *Stevens*, 78 Cal.App. 395 [248 P. 696]; *People* v. *Collier*,

111 Cal.App. 215 [295 P. 898]; *People* v. *Duran*, 57 Cal.App. 2d 363 [134 P.2d 305]; *People* v. *Black*, 45 Cal.App.2d 87 [113 P.2d 746].) The reason for this rule is apparant, for from the clandestine nature of conspiracy, and the often studied efforts of the participants to conceal their connections with each other, it would rarely be possible to obtain independent evidence of a formal agreement between them. It need not be shown, therefore, that the parties actually came together and agreed to enter into and pursue a common design. (*People* v. *Fitzgerald*, 14 Cal.App.2d 180 [58 P.2d 718].) Quoting 5 California Jurisprudence, section 3, page 497: "It is sufficient, if they, in any manner, or through any contrivance, positively or tacitly come to a mutual understanding to accomplish a common and unlawful design."

The existence of the assent of minds which is involved in a conspiracy may be, and from the secrecy of the crime usually must be, inferred by the jury from the proof of facts and circumstances which, taken together, apparently indicate that they are mere parts of the same complete whole. (*People* v. *Burke*, 18 Cal.App. 72 [122 P. 435]; *People* v. *Jones*, 136 Cal.App. 722 [29 P.2d 902]; *People* v. *Benenato*, 77 Cal.App. 2d 350 [175 P.2d 296].) In *People* v. *Fitzgerald, supra,* at page 201, the following language is quoted with approval from Wharton's Criminal Law, volume 2, section 1667: "The actual fact of conspiracy may be inferred, as has been said, from circumstances, and the concurring conduct of the defendants need not be directly proved. Any joint action on a material point, or collocation of independent but conspiring acts, by persons closely associated with each other, is held to be sufficient to enable the jury to infer concurrence of sentiment; and one competent witness will suffice to prove cooperation of an individual conspirator."

In the case of *People* v. *Malone*, 20 Cal.App.2d 1 [66 P.2d 216], it was urged that the evidence showed that the defendant had no direct contact with any of the complaining witnesses. The court said, on page 6: "Such evidence is not conclusive on the question before us and we are of the opinion that there was ample indirect evidence to sustain the implied finding as to existence of the conspiracy. Indirect evidence is ordinarily all that is available to prove conspiracy and it is sufficient for that purpose. (*People* v. *Coffelt*, 140 Cal.App. 444 [35 P.2d 374]; *People* v. *Ferguson*, 134 Cal.App. 41 [24 P.2d 965]; 5 Cal.Jur. 521.)"

A conspiracy may result from the actions of de-

fendants in carrying out a common purpose to achieve an unlawful end. (*People* v. *Montgomery*, 47 Cal.App.2d 1 [117 P.2d 437].) The law fixes no time in which it must have been entered into and it does not provide that it have any particular duration. (*People* v. *Yeager*, 194 Cal. 452 [229 P. 40].) It is sufficient if in any manner the conspirators tacitly come to a mutual understanding to commit a crime. (*People* v. *Yeager*, supra; *People* v. *Sisson*, 31 Cal.App.2d 92 [97 P.2d 420]; *People* v. *Torres*, 84 Cal.App.2d 787 [192 P.2d 45].)

In the light of these rules as applied to the evidence here, we cannot say that the jury was not reasonably justified in its conclusion that evidence other than the testimony of accomplices tended to connect appellant Caddel with the commission of the offenses of which he was convicted. As said in *People* v. *Nikolich*, 93 Cal.App. 356, at page 358 [269 P. 721] : "The entire conduct of the defendant may be looked to for the corroborating circumstances and if from those circumstances the connection of the accused with the crime may fairly be inferred, the corroboration is sufficient. (*People* v. *Yeager*, 194 Cal. 452 [229 P. 40] ; *People* v. *Martin*, 102 Cal. 558 [36 P. 952] ; *People* v. *Demera*, 64 Cal.App. 121 [220 P. 673].)" See, also, *People* v. *King*, 40 Cal.App.2d 137 [104 P.2d 521].

 Nor is it necessary, in order to be held criminally liable, that a defendant must be shown to have been a member of a conspiracy from its inception. On the contrary, one who joins a conspiracy after it is formed, and actively participates in it, thereby adopts the previous acts and declarations of his fellow conspirators. (*People* v. *Jones*, 25 Cal. App.2d 517 [77 P.2d 897] ; *People* v. *Fitzgerald*, 14 Cal.App. 2d 180 [58 P.2d 718] ; *People* v. *Schmidt*, 33 Cal.App. 426 [165 P. 555].) Under such circumstances the previous acts and declarations of his fellow conspirators, although done or made before he joins the conspiracy, are admissible against him. In this connection the court, in *People* v. *Fitzgerald*, supra, says at page 203 : "In *United States* v. *Logan*, 45 F. 872, the court, referring to a conspirator, instructed the jury that 'his connection with it (the conspiracy) at any time makes him liable for all that has been done by any of his coconspirators in pursuance of the conspiracy.' This rule has definitely been adopted and applied in this state in the case of *People* v. *Schmidt*, 33 Cal.App. 426 [165 P. 555]."

At the time appellant Caddel made his unannounced visit to Sheriff Broaddus, the jury could reasonably have concluded

that both of the conspiracies charged here were not only formed but that they were at that time in active operation. The original slot machines of Gray, and those brought from Los Angeles by Griffin, were on location in the various resorts, and proceeds from them were being collected by appellant Griffin and Gray and entered in the books of the business. Income from the machines for the month of April was in excess of $1,000. Grange had given McCarty $100 for Sheriff Broaddus, and Mulligan had been to Lane's Flat and made his first collection. The conspirators had made their declarations to Sheriff Broaddus, Deputy Sheriff White, and to McCarty as to their claimed connection with the attorney general's office, and outlined the manner in which the confirmatory sign would be given. The record shows that with the stage thus set appellant Caddel appeared on the scene and performed the role as it had been predicted.

On the morning following appellant Caddel's visit to the sheriff's office the first act of bribery, charged in Count Three of the indictment, was committed. The other two acts of bribery also occurred subsequent to this visit. Appellant Mulligan was in Mendocino County on the occasion of each one of the acts of bribery.

When a conspiracy is shown to exist, every act done by any one of the conspirators in furtherance of the object of the conspiracy is deemed to be the act of all the conspirators.

It is one of the functions of the jury to draw proper inferences, and if the inference so drawn does not do violence to reason, this court will not interfere. (*People* v. *Latona,* 2 Cal.2d 714 [43 P.2d 260].)

In the case of *People* v. *Burton,* 91 Cal.App.2d 695, 708 [205 P.2d 1065], we quoted the following language from *People* v. *Rubio,* 74 Cal.App.2d 697 [171 P.2d 737], which we believe to be equally applicable here: ". . . if the circumstances relied upon by the prosecution reasonably justify an inference of guilt, but an inference of innocence might also reasonably have been drawn, it was for the jury, as between these two inferences, to choose, and unless it is obvious that the evidence does not warrant the inference of guilt adopted by the jury, this court is powerless to interfere."

In conclusion of this phase of the appeal we are satisfied that the evidence as a whole was sufficient to justify the verdicts of the jury and the convictions of each appellant.

We will now consider the remaining points raised by the appellants' appeals.

### APPEAL OF WILLIAM GRIFFIN

██ It is urged by appellant Griffin that the portion of the evidence relating to the transportation of slot machines should not be considered inculpatory for the reason that the mere possession or control of slot machines is not penalized by section 330a of the Penal Code. (*Chapman* v. *Aggeler*, 47 Cal.App.2d 848 [119 P.2d 204].) This contention overlooks the fact, however, that the record here contains abundant evidence that the slot machines were placed on location and operated illegally, and that the evidence of moving them could have been considered by the jury as corroborative of accomplice testimony of steps taken in furtherance of a conspiracy, and as tending to show appellant Griffin's participation therein.

██ It is next contended that the evidence was insufficient to establish a corpus delicti as to appellant Griffin. The argument in support thereof is predicated upon the rule that the corpus delicti of an offense must be established before evidence is received of the confession or admission of the defendant. There is a distinction between the declarations of an accomplice made during the course of a conspiracy and the testimony of a conspirator given at a trial and while under oath and subject to cross-examination. Standing alone, such testimony is ordinarily sufficient to prove the corpus delicti of an offense, leaving to the corroboration by other evidence the proof of the criminal agency, or such evidence as tends to connect the defendant with the commission of the offense. (*People* v. *Brown*, 59 Cal. 345; *People* v. *Zimmerman*, 3 Cal.App. 84 [84 P. 446]; *People* v. *Thompson*, 16 Cal.App. 748 [117 P. 1033]; *People* v. *Leavens*, 12 Cal.App. 178 [106 P. 1103]; *People* v. *Mazzola*, 99 Cal.App. 682 [279 P. 211]; *People* v. *Briley*, 9 Cal.App.2d 84 [48 P.2d 734].) In a conspiracy, however, the proof of the existence of the underlying agreement and the connection of the defendant therewith may in some cases be of such a single and inseparable nature as to require corroboration of both elements. (*People* v. *Doble*, 203 Cal. 510 [265 P. 184]; *People* v. *Seitz*, 209 Cal. 199, 205 [286 P. 697].)

We have already pointed out that the existence of a conspiracy often must be inferred by the jury from the proof of facts and circumstances, which, taken together, apparently indicate they are mere parts of the same complete whole. Consequently, the existence of a conspiracy and the participation therein by a defendant may be proven by circumstantial

evidence. In like manner, the proof of the corpus delicti may be established by circumstantial evidence. It is not necessary that the corpus delicti, prior to the introduction of admissions or confessions of the defendant, be established by evidence of a clear or convincing character, or by such as would be required to support a conviction. It may be sufficient even though shown by slight or prima facie proof. (*People* v. *Fierro,* 58 Cal.App.2d 215 [136 P.2d 94] ; *People* v. *Alexander,* 67 Cal.App.2d 107 [153 P.2d 402] ; *People* v. *Day,* 71 Cal. App.2d 1 [161 P.2d 803] ; *People* v. *Harshaw,* 71 Cal.App.2d 146 [161 P.2d 978] ; *People* v. *Wade,* 71 Cal.App.2d 646 [163 P.2d 59].)

We are mindful, also, that the order of proof in a case is a matter within the discretion of the trial court, and its rulings thereon will not be disturbed on appeal except on clear proof of an abuse of that discretion. (*People* v. *Stokes,* 5 Cal.App. 205 [89 P. 997] ; *People* v. *Donnolly,* 143 Cal. 394 [77 P. 177].) In the case of *People* v. *Watters,* 202 Cal. 154 [259 P. 442], prejudicial error was claimed because the trial court permitted the introduction in evidence of certain alleged admissions of the defendant before the corpus delicti had been sufficiently established by other proof. The Supreme Court disposed of the contention in the following language, at page 157 :

"The appellant's next contention is that the trial court committed reversible error in relation to the order of proof, in that it permitted the introduction in evidence of certain alleged admissions of the defendant before the *corpus delicti* had been sufficiently established by other proof. This objection goes only, however, to the order of proof, and it has been a long-established rule of criminal procedure in this state that the order of proof is a matter within the discretion of the trial court, and that its rulings thereon will not be disturbed except upon clear proof of an abuse of that discretion. (*People* v. *Jones,* 31 Cal. 567; *People* v. *Daniels,* 105 Cal. 262 [38 P. 720] ; *People* v. *Jones,* 123 Cal. 65 [55 P. 698] ; *People* v. *Rodley,* 131 Cal. 240, 253 [63 P. 351] ; *People* v. *Donnolly,* 143 Cal. 398 [77 P. 177].) "

The order of proof in a conspiracy case is considered in *People* v. *Ferlin,* 203 Cal. 587 [265 P. 230]. An objection had been made and overruled at the trial to the introduction of certain coversations, on the ground that there had been no antecedent and independent proof tending to establish a conspiracy between the defendant and the witness Hill, and that

such evidence was not admissible for the purpose of establishing one. The testimony was also objected to as being hearsay. The court quoted with approval, at page 599, the following language from *People* v. *Matthew*, 68 Cal.App. 95, 107 [228 P. 417]:

· "It unquestionably is the general rule that proof of the existence of the conspiracy ordinarily should precede proof of the acts or declarations of a co-conspirator made pending the conspiracy and in aid and furtherance of the common design. But the rule in this respect is not absolute and unyielding; and sometimes, for the sake of convenience, evidence of the acts and declarations of an alleged conspirator is admitted before sufficient proof of the conspiracy is given. Thus, where, as here, the facts from which the conspiracy is to be inferred are so intimately blended with other facts going to constitute the crime that it is difficult to separate them, it is not essential to the introduction of evidence of the acts and declarations of one of the conspirators that evidence should first be introduced to establish *prima facie*, in the opinion of the court, the fact of conspiracy. (*People* v. *Fehrenbach*, 102 Cal. 394 [36 P. 678] . . . *People* v. *Sing*, 42 Cal.App. [385] 397 [183 P. 865]. . . .)"

Our conclusion on the matter is that the corpus delicti here was sufficiently established. As to the order of proof, we do not deem it necessary to refer again to the multitudinous facts of this case. Suffice it to say that whatever variance there was in the order of proof could reasonably be attributed to the difficulty of the subject matter, and that, in the regulation thereof, the trial court acted within the exercise of sound discretion. We do not perceive any such abuse of this discretion as would warrant a reversal.

### APPEAL OF JAMES MULLIGAN

The contentions of this appellant that the evidence was insufficient to support the judgments of conviction and that the testimony of accomplices was not corroborated have already been considered and ruled upon.

Appellant Mulligan, like appellant Griffin, also urges that the evidence was insufficient to establish the corpus delicti as to him, and closely allied to this point, he assigns as error the trial court's ruling in denying his motion to strike certain testimony. We will consider these two points together.

At the conclusion of the prosecution's case, counsel for appellant Mulligan moved to strike the testimony of certain

witnesses which had previously been admitted as to Mulligan, on the ground that the testimony constituted hearsay and did not serve to link Mulligan with the alleged conspiracy. We have already considered the quantum of proof necessary to establish the corpus delicti. On this point we hold, as on the appeal of appellant Griffin, and by a parity of reasoning, that the order of proof was in the sound discretion of the trial court, and we see no such abuse of that discretion as to constitute prejudicial error. We further hold that the motion to strike was properly denied.

As his next assignment of error appellant Mulligan asserts that the district attorney was guilty of misconduct in the manner in which the case was dismissed as against defendants Gray and McCarty. The precise contention urged is that appellant Mulligan was required to select a jury at a time when Gray and McCarty were still codefendants; and that he was compelled to exercise peremptory challenges with them jointly. He also calls attention to the fact that at one time during the selection of the jury the People and all of the defendants, except McCarty, announced that they were satisfied with the jury. McCarty then exercised a separate challenge and removed the juror. This, according to appellant Mulligan, denied him a right to a jury of his choice. However, the record shows that after the exercise of this challenge by McCarty the examination of prospective jurors continued, and that appellant's counsel participated therein. One prospective juror was thereafter excused by appellant Mulligan by the exercise of the only peremptory challenge which he chose to use. Subsequently, appellant Mulligan announced that he was satisfied with the jury, and, when the jury was thereafter accepted by all of the defendants, appellant Mulligan stated that he was still satisfied with the jury. The jury sworn to try the case was accepted by appellant Mulligan at a time when he still had peremptory challenges remaining which he could have exercised had he seen fit to do so. Under such circumstances we do not find that appellant suffered prejudice. (*People* v. *Patterson*, 58 Cal.App.2d 837 [138 P.2d 341]; *People* v. *Harris*, 45 Cal.App. 547 [188 P. 65].)

The right of a district attorney to request the court for a dismissal of prosecution as to a defendant jointly indicted with another, for the purpose of using him as a witness, is granted by statute. (Pen. Code, § 1099.) It is a practice recognized in this and other jurisdictions, and the exercise of the same by the prosecuting officer is not misconduct. Such

a motion may be made at any time prior to the closing of the People's case, and when granted by the court immunity is extended by law to the erstwhile defendant.

In the case of *People* v. *Walther*, 27 Cal.App.2d 583 [81 P.2d 452], the court said that when immunity from prosecution has been offered to a defendant in reward for his testimony, the cause should be promptly dismissed against him. We agree with this statement, but from the record cannot find, without indulging in speculation or conjecture, that such action was not taken here. In the absence of evidence in the record to the contrary, it must be assumed on appeal that the actions of the district attorney are not in bad faith. (*People* v. *Ciulla*, 44 Cal.App. 719 [187 P. 46].) Under such circumstances we must hold that the action of the district attorney did not constitute prejudicial misconduct.

 The final contention of appellant Mulligan is that the district attorney committed prejudicial misconduct in the improper presentation of the testimony of Admiral Standley, called as a witness for the People. The record shows that this testimony was offered and expressly limited by the court to appellant Caddel. No objection was made at first to the testimony of Admiral Standley by appellant Mulligan. However, during the course of his testimony appellant Mulligan made an objection to it, on the ground, among others, that it looked like ''an attempt to get in a back window when the front door and back doors are closed. It is an indirect approach on this.'' The court overruled the objection but in so doing specifically instructed the jury that the testimony was received only as against the defendant Caddel and not against defendant Mulligan. The evidence was admissible against Caddel, and was expressly limited to him. The jury being specifically so instructed, we can see no prejudicial misconduct in the district attorney's method of introducing it. (*People* v. *Wade*, 71 Cal.App.2d 646 [163 P.2d 59]; *People* v. *Trotter*, 120 Cal.App. 54 [7 P.2d 731]; *People* v. *Burdg*, 95 Cal.App. 259, 268 [272 P. 816].)

The use of the term ''bag man'' by the district attorney in his argument to the jury is also assigned as prejudicial misconduct. We believe this assignment to be without merit.

### Appeal of Wiley H. Caddel

The sufficiency of the evidence to support the judgment of conviction as to this appellant has already been passed upon, as well as the question of corroboration of the testimony of accomplices. The remaining assignments of error raised by

this appellant will now be considered in the order in which they are presented.

It is urged first that the district attorney was guilty of prejudicial misconduct in offering in evidence certain testimony of Sheriff Broaddus relating to a conversation with McCarty. The substance of this conversation was that McCarty had advised the sheriff that on the same day that appellant Caddel had made the visit to the sheriff's office a man had also called upon McCarty. This man represented that he had been to see the sheriff, and then stated to McCarty that he (the man) wanted $4 per week per machine for the attorney general's office. When McCarty gave the sheriff this information the two then compared notes and developed a similarity in stature and dress between Caddel and the man. This testimony was admitted in evidence prior to the dismissal of the case as to McCarty and therefore while he was still a defendant. In relation to it the trial court instructed the jury as follows: "Ladies and gentlemen of the jury, in order that there may be no misunderstanding about the situation and that you may be fully advised and informed, Mr. Broaddus, who is now a witness on the stand, has among other things testified to certain conversations had between him and defendant McCarty, and I instruct you now that the testimony concerning such conversations with McCarty are admitted only as against the defendant McCarty and are not to be considered by you as binding upon any other of the defendants."

At a subsequent time in the trial, and after the court had granted the prosecution's request for discharge as to McCarty, so that he might be made a witness for the People, the court, upon motion of the defendants, struck out of evidence the conversations between Sheriff Broaddus and McCarty, as follows: "Well, the motion will be granted and all testimony given by the witness Sheriff Broaddus relative to all conversations between him and Paul McCarty will be stricken, and the jury is instructed to disregard all the testimony that has by order of the court been stricken or which hereafter may be stricken."

When McCarty was sworn as a witness he was questioned upon direct examination, without objection, as to the identity of the man with whom he had the conversation, as reported to Sheriff Broaddus. McCarty testified definitely that "the man" was not appellant Caddel.

A review of these circumstances induces the conclusion

that the evidence in the first instance was properly admissible as against defendant McCarty. The court so limited it by a proper instruction to the jury, and then subsequently struck the testimony of the conversation from the record. Evidence was then adduced from the one person who would know, namely, McCarty, that "the man" was not Caddel. We cannot perceive that prejudice resulted therefrom to appellant Caddel.

The next assignment of prejudicial misconduct on the part of the district attorney is based upon a charge that immunity had been promised in advance to defendants Paul McCarty and Robert Gray, and that by delaying dismissals as to these defendants, appellant Caddel was compelled to select a jury while they were being tried as codefendants. This same contention has been considered, *supra,* in the appeal of William Mulligan. For the reasons heretofore given we hold the conduct of the district attorney not to have been prejudicial. The record does not support the claim that the prosecution intended to dismiss the charges against defendants Gray and McCarty before the jury was selected. Neither does it show that appellant Caddel was forced to accept a jury unsatisfactory to him because of the presence of the other two codefendants.

Appellant next recites as prejudicial error certain rulings of the trial judge. The first concerns trial procedure. The record shows that shortly after the taking of testimony had begun the trial court gave consideration to alternate methods of procedure and took cognizance of the problems in connection with each. After doing so, the court announced: "Well, it is difficult to look ahead and see which procedure would least encumber the record, but I am inclined to think probably that it would be less cumbersome to permit the prosecution to go ahead and pursue their remedy as they have apparently indicated that they desire to proceed. They have the laboring oar here. And then if they don't prove their conspiracy as against one or more of the defendants, then the defendants could make their motion to strike. I am rather inclined, I kind of lean toward the proposition that would be the better and less cumbersome way to proceed. And that will be the ruling and that will be the understanding, that the court will overrule your objections, gentlemen, with the propositions that if they don't connect your clients up the court will entertain a motion to strike the testimony."

In furtherance of this ruling, it was announced by the

trial court that appellants might have a "continuing objection to this line of testimony and at the proper time which the court thinks would be the proper time which would be at the time the prosecution rested their case, you may move to strike the testimony."

Counsel for appellant Caddel announced that this method of preserving appellant's objections would be satisfactory.

Although this practice, which is sometimes followed by trial courts, namely, of receiving evidence subject to its subsequently being connected with the case, is not to be commended as a general rule of procedure, nevertheless it relates to the order of proof, and, as we have already said, will not constitute error unless there is shown to have been a clear abuse of discretion by the trial court. Such does not appear to be the case here. The general rule, of course, requires that proof of the conspiracy to commit a crime must be shown as a foundation for the admission of the declarations of a co-conspirator. This rule is not inflexible, however, and where the facts are intimately blended the trial court is given considerable discretion in determining the order of proof. The rule as given in 2 Wharton's Criminal Evidence, 11th Edition, section 727, pages 1221-1222, is as follows:

"While the general rule is that proof of a conspiracy to commit a crime must be shown as a foundation for the admissibility of the acts and declarations of a co-conspirator, the trial court is allowed a wide discretion in determining the order in which the proof shall be introduced upon the trial. Especially where the crime has to be established by circumstantial evidence, the prosecutor must be given permission to present the proof bit by bit, as best he can, without a rigid enforcement of the rule requiring the proof of the conspiracy as a foundation for the admission of acts and declarations of co-conspirators. On authority and for reasons of practicality, if the whole of the evidence establishes a conspiracy, the order in which the acts and declarations of the co-conspirators are established loses its significance, and the question is really one of sufficiency of the proof rather than the order of its introduction. The only practical way to handle such a situation is to admit the evidence with the admonition that its competency depends upon the finding of the ultimate fact that the conspiracy existed. If it should not be found to exist, then such evidence must be disregarded, and the court should so charge and admonish the jury."

To the same effect see *People* v. *Daniels,* 105 Cal. 262 [38 P. 720] ; *People* v. *Ferlin, supra*; *People* v. *Beck,* 60 Cal.App. 417 [213 P. 61] ; *People* v. *Henry,* 86 Cal.App.2d 785 [195 P.2d 478].

The next ruling of the trial court urged by appellant as prejudicial error is the denial of appellant's motion for mistrial. This assignment of error is predicated upon the allegations of prejudicial misconduct of the district attorney, and has already been considered and passed upon. We therefore hold the denial of motion for mistrial to have been without error. Neither do we find error in the trial court's rulings in denial of motion for an advisory verdict or in denial of motion to strike evidence.

Appellant next contends that the demurrer to Count One of the indictment should have been sustained. The basis for this contention is that Count One charges appellant and the other defendants with a conspiracy to give and offer bribes and to ask for and agree to receive bribes. Appellant argues that since it is impossible to act inconsistently by both giving and receiving a bribe, it is impossible to conspire so to act. In support of this contention the appellant relies heavily upon *People* v. *Keyes,* 103 Cal.App. 624, 646 [284 P. 1096]. The Keyes case is authority for the proposition that a set of defendants may conspire to give a bribe, or a set of defendants may conspire to receive or accept a bribe, but that bribery requires for its consummation an unlawful concert of one or more persons acting with one or more persons having a different motive or purpose. The court held that the defendants, other than Keyes, were properly charged with a conspiracy to offer and give a bribe, but that as to defendant Keyes the criminal conspiracy could not be charged.

It will be noted that the Keyes case presents a situation which was entirely bi-lateral, there being on one side the givers of the bribe and on the other the receiver. The rational of this holding would not be applicable to a situation as presented by the pleadings here. (*People* v. *Savage,* 15 Cal.App.2d 72 [59 P.2d 190].) In the indictment under attack the defendants are charged with a conspiracy to give and offer bribes to executive officers of this state with the intent to influence such officers with respect to their action and decision as such officers and did wilfully conspire, combine, confederate and agree together, and with each other, to ask for and to receive bribes as executive officers and employees of this state.

It will be noted that the indictment is silent as to the iden-

tity of the executive officers to whom the bribes were to be given and offered. Under the framework of this part of the indictment evidence was introduced of bribes being given to Sheriff Broaddus and Deputy Sheriff White, non-members of the conspiracy.

The second portion of the indictment charging the receiving of bribes by an executive officer or employee of the state was likewise silent as to the person or persons from whom the bribes were to be received. Under the framework of this portion of the indictment the prosecution offered evidence that the money so received had been collected on behalf of the conspiracy directly from the operation of slot machines, and deducted from the resort owner's share of the proceeds.

Under such circumstances we do not believe that the language of the Keyes case, *supra,* supports appellant's contentions here. An indictment may certainly allege a conspiracy in which an executive officer or employee of the state is charged with being a member of a combine which has for its purpose the offering or giving of bribes to another executive officer. It may also allege, as a part of the conspiracy, a further purpose to ask for and receive bribes. There is nothing incompatible with the same set of persons conspiring to commit both crimes, nor can it be maintained that in such a situation there follows a merger of conspiracy and of the substantive offense.

It is true that the allegations of the indictment here were general, and in the face of a special demurrer could have been particularized. However, as pointed out in *People* v. *Yant,* 26 Cal.App.2d 725 [80 P.2d 506], the accusatory pleading shall be sufficient if it charges "in any words sufficient to give the accused notice of the offense of which he is accused." (Pen. Code, § 952.) The details and particular circumstances thereof may be obtained from the transcript of the testimony given at the preliminary examination or upon which the indictment was founded. (*People* v. *Beesly,* 119 Cal.App. 82 [6 P.2d 114, 970]; *People* v. *Curtis,* 36 Cal. App.2d 306 [98 P.2d 228].)

In any event, a judgment will not be reversed because of an error in the form of an indictment unless the error complained of has resulted in a miscarriage of justice. This we do not find to have occurred here. (Const., art. VI, § 4½; *People* v. *Curtis, supra; People* v. *Beesly, supra; People* v. *Pierce,* 14 Cal.2d 639 [96 P.2d 784].)

██ Appellant's final contention is that the trial court erred in giving to the jury the following instruction:

"The jury will observe that in count I of the Indictment the defendants are charged generally speaking with conspiracy to give and offer bribes and also to ask for and agree to receive bribes.

"A count in an Indictment which so accuses defendants is deemed supported if the proof shows beyond a reasonable doubt that they are guilty of conspiracy to either give and offer bribes or to ask for and agree to receive bribes as so alleged in the Indictment.

"However, it is important for you to keep in mind that in order to convict a defendant in such a case it is necessary that you all agree as to the same one or more particular acts found to have been committed by such defendant. In other words, in order for you to convict under said count I it is necessary that you all agree that the conspiracy was either to give and offer bribes to executive officers of this state or to ask for and agree to receive bribes as executive officers and employees of this State, or both, as alleged in the Indictment."

It is urged that such an instruction was erroneous for the reason that the jury was told that the conviction of a defendant would be proper if it were shown that all of the conspirators intended to violate only one of the two named sections of the Penal Code. Stated conversely, the contention of appellant, if upheld, would have required an instruction by the court that the defendants could not have been found guilty of conspiracy unless it were shown that they conspired to violate both of the said Penal Code sections. This same proposition was urged in *People* v. *Marvin*, 48 Cal.App.2d 180 [119 P.2d 413], wherein the indictment charged a conspiracy both to violate the Corporate Securities Act and to commit grand theft. The court said, at pages 196-197: "Appellants' request that the jury be instructed that it was necessary to find the existence of a conspiracy both to violate the Corporate Securities Act and to commit grand theft in order to find appellant Marvin guilty of the charge of conspiracy, contained in the first count against him, was properly refused." (*People* v. *Yant, supra.*) We must, therefore, hold that the instruction above quoted was properly given, and was a correct statement of the law.

We have canvassed *seriatim* the various assignments of error raised by appellants on their respective appeals, and find

none that singly or jointly requires a reversal of the judgment of conviction here. On the contrary, a review of the record induces the conclusion that appellants and each of them were fairly tried and under the evidence justly convicted.

The judgments of conviction and orders denying motions for new trials are affirmed.

The opinion was modified to read as above and a petition for a rehearing was denied June 24, 1950, and appellants' petition for a hearing by the Supreme Court was denied July 10, 1950. Gibson, C. J., and Schauer, J., voted for a hearing.